Submitted January 4, 2013, convictions for interfering with a peace officer reversed and remanded; otherwise affirmed March 26, petition for review denied October 2, 2014 (356 Or 397)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ALEXANDER ALEXANDERVI BISTRIKA,
*Defendant-Appellant.*

Marion County Circuit Court
09C47659; A146752

322 P3d 583

Steven J. Sherlag filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant appeals a judgment of conviction on three counts of interfering with a peace officer, ORS 162.247, two counts of resisting arrest, ORS 162.315, and one count of disorderly conduct in the second degree, ORS 166.025. His convictions arose out of an incident that happened on his family's property after his mother called for emergency assistance, the responding deputy sheriffs overstayed their welcome, and he and other family members were arrested. He assigns error to the trial court's denial of his motion to suppress, motions for judgment of acquittal, and motion to merge the guilty verdicts for interfering with a peace officer. Defendant also assigns error to the trial court's refusal to give his proposed jury instruction on the dissipation of an emergency under the emergency-aid doctrine and to the delivery of the state's proffered jury instruction on community caretaking. We hold that the trial court properly denied defendant's motion to suppress evidence, as well as defendant's motion for judgment of acquittal on the interfering and disorderly conduct charges. However, we hold that the trial court did commit instructional error, and we reverse and remand the three counts of interfering with a peace officer;otherwise we affirm. We thus do not reach the alleged error regarding defendant's motion to merge the verdicts on those charges.

### MOTION TO SUPPRESS

We state the pertinent facts for each assignment of error separately, beginning with the motion to suppress. We take the facts from the evidence presented at the suppression hearing, *State v. Mazzola (A139257)*, 238 Or App 201, 203, 242 P3d 674 (2010), recognizing that we are bound by the trial court's findings of fact if there is evidence in the record to support them, *State v. Vasquez-Villagomez*, 346 Or 12, 23, 203 P3d 193 (2009).

At about 2:00 a.m. on a summer night, defendant's mother placed an emergency call to request help in rescuing defendant, whom she thought had fallen into a pond on the family's property. That property is located at the end of a long driveway in a rural, mixed farm and residential area outside of Salem. Although the fire department normally

responds to water rescue calls, Deputy Sheriff Lane was the closest to the address and was the first to arrive at the scene. When Lane arrived, he met several members of defendant's family, including defendant's mother, who, at that point, was hysterical about her son's welfare. She walked to the pond with Lane, and together they looked for defendant. Lane questioned defendant's mother, trying to ascertain defendant's location. After some questioning, defendant's mother admitted that she had not seen defendant fall into the pond. At about that time, Deputy Sheriff Lucca and Battalion Chief Wineman of the Marion County Fire Department both arrived at the scene.

Shortly thereafter, defendant arrived at the pond, dry and unharmed. He informed the deputies that he was the person they were looking for, that he had not fallen into the pond, and that they should "get the fuck off [his] property." Although Lane initially testified that, at that time, he was unsure whether defendant was the one who purportedly had fallen into the pond or if anyone else was injured, on cross-examination, Lane admitted that once defendant showed up, the deputies "did not need to look for him anymore[,]" nor did they have information leading them to believe that anyone else was in the pond, that defendant was suicidal, or that a crime was in progress on the property.

After arriving at the scene, defendant continued to use abrasive language to inform the deputies that he was fine and that they were not welcome on his property. Lucca turned to defendant's mother—who was still highly emotional—to ask questions about why she had called for a water rescue and what defendant had told her. When Lucca attempted to speak with defendant's mother, defendant's sister arrived, tried to pull her mother away from the deputy, and told her not to speak with the deputies. Defendant's sister also told the deputies to "get the fuck off [the] property." As Lucca attempted to arrest her for interfering with a peace officer, defendant's sister pulled her hands free and retreated toward her family. At that point, Lane requested additional patrol units to come to the scene to assist because defendant's sister was resisting arrest, and five to six family members, including defendant, were yelling aggressively at the two deputies, whose efforts to calm the situation were unavailing.

When a third deputy sheriff, Hunter, arrived at the scene, Lane and Lucca informed him that defendant's sister was under arrest. Defendant and his family became upset when Hunter began to take physical custody of defendant's sister; they did not follow orders from Lane to stay back and kept trying to push past Hunter to reach her. Lane testified that defendant's actions, along with those of his family, raised officer safety concerns. Defendant protested the loudest of all the family members, often using profanity to make his points, and was the most aggressive in trying to get past Hunter to reach his sister. As a result, Hunter eventually told defendant that he was under arrest. Defendant and Hunter then struggled, at one point falling down to the ground, as Hunter effected the arrest.

Defendant was charged with three counts of interfering with a peace officer, ORS 162.247; three counts of resisting arrest, ORS 162.315;[1] and one count of disorderly conduct in the second degree, ORS 166.025. His sister, his mother, and his father were also charged with the commission of various crimes arising out of the events of that night.[2]

Before their consolidated trial, defendant and his codefendant family members moved to suppress all evidence collected after defendant was found dry and unharmed. The trial court granted the motion to suppress as to defendant's parents, but not as to defendant and his sister. The trial court determined that, although the deputies had been lawfully present on defendants' property pursuant to the emergency-aid exception to the warrant requirement, once defendant appeared dry and unharmed, the emergency had dissipated, as had the basis for the deputies to remain pursuant to that exception. The trial court nonetheless refused to suppress the evidence, citing *State v. Janicke*, 103 Or App 227, 796 P2d 392 (1990), in which we held that the exclusionary rule

---

[1] The trial court later granted defendant's motion for judgment of acquittal on one cout of resisting arrest.

[2] In a separate appeal, defendant's sister challenges the denial of her motion to suppress as well as her convictions for disorderly conduct and interfering with a peace officer. Defendant's mother and father, charged with disorderly conduct, interfering with a peace officer, and resisting arrest (mother only), prevailed in the state's interlocutory appeal of the suppression ruling in their favor. *State v. Bistrika*, 247 Or App 766, 274 P3d 315 (2012).

does not apply to evidence of new crimes against police officers during unlawful stops or entries. We review the trial court's denial of defendant's motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

At a hearing on a defendant's motion to suppress, the state bears the burden to show, by a preponderance of the evidence, that the challenged evidence was lawfully obtained. ORS 133.693(4); *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000) ("[C]onsistent with ORS 133.693(4), the burden is on the state to prove that the warrantless search did *not* violate a protected interest of the defendant." (Emphasis in original.)). We agree with the trial court's reliance on *Janicke* to deny the suppression motion based on defendant's actions when Lucca, and later Hunter, attempted to arrest his sister.

First, contrary to the state's argument, the trial court properly concluded that the emergency that brought the deputies to the family property had dissipated when defendant was found safe and dry. Lane admitted that he had no reason to believe there was any criminal activity afoot, that defendant was suicidal, or that anyone else had fallen into the pond and needed rescuing after defendant came forward. At that point, there ceased to be sufficient facts to support an objectively reasonable belief "that a warrantless entry [was] necessary to either render immediate aid to persons, or to assist persons who have suffered or who are imminently threatened with suffering, serious physical injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011) (footnotes omitted).

Second, assuming a violation of defendant's rights under Article I, section 9, of the Oregon Constitution, and contrary to defendant's argument, the trial court correctly denied defendant's motion to suppress despite the dissipation of the emergency on account of a line of cases, including *Janicke*, that began with *State v. Gaffney*, 36 Or App 105, 583 P2d 582 (1978), *rev den*, 285 Or 195 (1979). In *Janicke*, police officers entered the defendant's house to question him, which resulted in an altercation and a struggle between the officers and the defendant. 103 Or App at 230. The trial court granted the defendant's motion to suppress evidence

related to the assault, harassment, and resisting arrest charges against him, because they were precipitated by the officers' unlawful entry. *Id.* We reversed, noting that "we have declined to extend the exclusionary rule to evidence of crimes committed against police officers during what turns out to be an illegal stop or entry." *Id.* (citing *State v. Burger*, 55 Or App 712, 716, 639 P2d 706 (1982), and *State v. Weiland*, 72 Or App 25, 695 P2d 85, *rev den*, 299 Or 32 (1985)).

More recently, in *State v. Neill*, we applied the *Gaffney* line of cases to a defendant who did not act out "against" a police officer but, rather, acted in a way that "threatened the officer's safety * * *." 216 Or App 499, 507, 173 P3d 1262 (2007), *rev den*, 344 Or 671 (2008) (internal quotation marks omitted). The defendant in *Neill* disobeyed police officers' orders to sit down and not to move—orders given when they entered her apartment to locate her boyfriend after her son had reported a potential domestic abuse situation and the officers observed blood on her clothing. Despite those orders, as police were escorting her boyfriend away, the defendant began yelling at the officers, jumped up, and ran down the hallway toward the back bedroom. Although an officer attempted to hold her back, the defendant dove under the bed. She grabbed a pair of shoes from under the bed, but one officer testified that she suspected that the defendant was reaching for a weapon. *Id.* at 507-08. We held that, "even assuming that the officers entered defendant's home unlawfully, the trial court correctly admitted evidence of her refusal to obey the officers' orders" because her refusal "reasonably led the officers to be concerned that defendant posed a legitimate threat to their safety and to their ability to maintain control of a potentially dangerous situation." *Id.* at 508.

In this case, the trial court determined that defendant's actions "were clearly a direct threat to the officers at the scene and hostile from the start." The court also explained that under *Janicke*, "courts will not apply the exclusionary rule to evidence of a new crime after an unlawful stop, arrest, or search if there is a threat to the officer's safety." The hearing record supports the trial court's

determination that defendant's actions posed a "threat to officer safety" for purposes of admitting evidence of defendant's subsequent crimes against the officers, namely, his acts of interference (ORS 162.247) and disorderly conduct (ORS 166.025). Defendant was shouting aggressively at the deputies, and was part of a group that significantly outnumbered the two deputies and that was sheltering defendant's sister, who had pulled away from one of the deputies. That conduct prompted Lane to request back-up to help reassert control over a rapidly devolving situation. When Hunter took defendant's sister into custody, defendant and the rest of his family crowded around the deputies. Defendant had to be pushed back. Accordingly, the trial court properly denied defendant's motion to suppress.

## MOTION FOR JUDGMENT OF ACQUITTAL ON INTERFERENCE COUNTS

We turn now to defendant's second, third, and fourth assignments of error, which, collectively, challenge the denial of his motion for judgment of acquittal (MJOA) on his three convictions under ORS 162.247(1)(b) for interfering with a peace officer. We state the facts presented at trial in the light most favorable to the state and review them to determine whether a rational factfinder could have found defendant's guilt beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995).

As stated earlier, as Lucca attempted to talk with defendant's mother about her emergency call, defendant's sister approached and tried to pull her mother away from the deputy. After repeated and unheeded warnings that her actions were interfering with the deputies' investigation, Lucca attempted to arrest defendant's sister. Defendant's sister retreated from Lucca and moved toward her family, at which point Lane and Lucca decided to wait until more officers arrived before attempting again to take defendant's sister into custody. Lucca then ordered defendant and the other family members to sit down on the ground so that the deputies could continue their investigation; defendant refused to obey.

When Hunter arrived and attempted to take defendant's sister into custody, Lane ordered defendant and his family members to stay back. Defendant did not obey and attempted to push past Lane and Hunter to reach his sister. Hunter also ordered defendant to stay back and had to push defendant back twice. After securing defendant's sister with handcuffs and telling her to stay put, Hunter returned to defendant and ordered him to calm down and to stop yelling. Defendant moved toward Hunter with his right hand raised, at which point Hunter told defendant that he was under arrest. Defendant and Hunter struggled as Hunter tried to take defendant into custody, and, eventually, Lucca helped Hunter subdue defendant and place him under arrest.

Defendant was charged with three counts of interfering with a peace officer, with each count addressing a different order by a different deputy. Under ORS 162.247(1)(b), a person commits the crime of interfering with a peace officer "if the person, knowing that another person is a peace officer," "[r]efuses to obey a lawful order by the peace officer ***." The parties primarily dispute whether the deputies' orders were "lawful." If they were, then defendant was not entitled to a judgment of acquittal on the three counts.

In support of his MJOA, defendant has asserted arguments at trial and on appeal that are similar to those that we addressed in the context of the motion to suppress. He argues that once the emergency dissipated, the deputies were on his family's property unlawfully and, therefore, all of their subsequent orders were *per se* unlawful. However, defendant's argument is foreclosed by *Neill*. As we explained in *Neill*, once defendant began acting in a way that threatened officer safety, evidence of those actions became admissible to prosecute defendant:

"[T]here is no principled distinction to be drawn between allowing the admission of evidence of a defendant's refusal to obey an order of the police under the circumstances described above and prosecuting the offense based on that evidence. If, as we have just held, evidence of defendant's refusal to obey the order is not subject to suppression on the ground that the entry was unlawful, then, under the same

principle, the order itself cannot be said to be unlawful for the purpose of precluding prosecution for failure to obey it."

216 Or App at 508. In addition, defendant overlooks that the "lawfulness of the order disobeyed is to be judged independently of the validity of the initial police-citizen confrontation." *State v. Rodinsky*, 60 Or App 193, 196, 653 P2d 551 (1982).

In this case, as in *Neill*, the orders that the deputies gave to defendant to sit down, to stay back, to stop yelling, and to calm down were a reaction to his threatening conduct. The record reveals that a rational factfinder could have found that, after exhibiting verbal hostility toward the deputies, defendant refused orders to sit down on the ground, was pushing against the deputies, and trying to rush past them to get to his sister once she was being taken into custody. As in *Neill*, the deputies' orders were "reasonable in light of that threat, and defendant's refusal to obey the orders added to the threat." 216 Or App at 508. Thus, contrary to defendant's argument, there was sufficient evidence for a jury to conclude that defendant refused to obey lawful orders by the three deputies, and the trial court properly denied defendant's MJOA on the three counts of interference under ORS 162.247.

## MOTION FOR JUDGMENT OF ACQUITTAL ON DISORDERLY CONDUCT COUNT

We next address defendant's fifth assignment of error, regarding the trial court's denial of his MJOA on the charge of second-degree disorderly conduct under ORS 166.025. Again, we view the record "in the light most favorable to the state" and determine whether "a rational trier of fact * * * could have found the essential element of the crime beyond a reasonable doubt." *Cunningham*, 320 Or at 63.

In relevant part, ORS 166.025 provides:

"(1) A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a) Engages in fighting or in violent, tumultuous or threatening behavior[.]"

Based on the facts discussed above, we readily conclude that a rational trier of fact could have found that defendant's behavior before his arrest was, at least, "threatening." Defendant argues that he was nevertheless entitled to prevail on his MJOA because the state proffered insufficient evidence to show that his conduct recklessly created a risk of *public* inconvenience, annoyance, or alarm.

At trial, various witnesses testified to the "rural" setting of defendant's property. Defendant's driveway ran about two hundred yards before sloping downhill and reaching the pond. There were no street lights around the driveway. The only people on the property that night were the emergency responders and defendant and his family. One of the firefighters who responded to the emergency call stood about one hundred feet from where defendant and the deputies were located and could not hear what was said between them. One witness estimated the distance to the closest residence to be "five or six times" the length of the courtroom. Defendant concludes from that evidence that the incident was in no way public.

We agree with the state that other evidence created at least a question for the jury as to whether there was "a risk of public inconvenience, annoyance, or alarm." Wineman testified that "the screaming and yelling was—was certainly loud, absolutely[,]" and, when counsel for the state asked him if it was "[s]omething that could be heard around the neighborhood?," he replied, "I would—I would think so." Lane testified that the area surrounding the property is not exclusively rural, but is, rather, a mixed farm and residential area. Lane also offered testimony in regard to the noise level at the scene that evening:

"[STATE]:   What was the level of noise that was going on with all of this happening?

"[LANE]:   There was a lot of yelling and screaming.

"[STATE]:   Would you characterize it as loud?

"[LANE]:   Yes, it was loud.

"[STATE]:   And is it something that, on a warm day, in kind of a loosely residential area, on a hot day, people have

their windows open? This is the kind of thing that they would hear, and would disturb them?

"*****

"[LANE]: Yeah, it could have—noise carries louder at—at nighttime. There's not as many cars on the road that would—going to deafen the noise."

Because a rational factfinder could have inferred that other individuals resided close enough to the property to have been—possibly or in fact—inconvenienced, annoyed, or alarmed by defendant's conduct, we affirm the trial court's denial of defendant's MJOA with respect to second-degree disorderly conduct.

## INSTRUCTIONAL ERROR

We turn next to defendant's sixth and seventh assignments of error, regarding the trial court's instructional rulings. Defendant contends that the trial court erred by declining to give his requested special jury instruction that, once defendant was found unharmed, the deputies were no longer lawfully on the property pursuant to the emergency-aid doctrine.[3] In defendant's view, the trial court's pretrial conclusion to that effect was law of the case and should have been submitted to the jury as such in the form of defendant's requested instruction. Defendant also argues that the trial court erred when, over his objection, it delivered the state's requested instruction stating that police officers are authorized to perform community caretaking functions and listing

---

[3] Defendant's requested instruction reads, in full:

"Defendant's Special Instruction [Emergency Aid Doctrine]

"You are instructed that, as a matter of law, the deputies in this case lawfully entered the Bistrika property pursuant to the emergency aid doctrine.

"You are further instructed that, once [defendant] was found unharmed and safe, the emergency had dissipated and the deputies were no longer lawfully on the property.

"You are also instructed that, once [defendant] was found unharmed and safe, the emergency had dissipated and the deputies were no longer lawfully on the property pursuant to the emergency aid doctrine.

"*State v. Davis*, 295 Or 227, 666 P2d 802 (1983), cited in the ruling of the Court, June 24, 2010, p 2[.]"

(First set of brackets in original.)

several examples of permissible functions.[4] According to defendant, that instruction was incomplete, inaccurate, and prejudicial because it "encouraged the jury to find that the deputies were lawfully on the property after they found out that appellant was unharmed and the emergency dissipated—vesting additional weight in the 'lawfulness' of the deputies' actions[.]" Defendant asserts that those instructional errors require reversal of his convictions on all counts because "the deputies' unlawfulness, and the Bistrikas' lawful demand that the deputies leave once the mistake was uncovered, inherently is relevant not [only] on * * * failing to obey a lawful order," but also "resisting arrest, and disorderly conduct—public order offenses." The state does not address the substance of defendant's arguments except to state summarily that the trial court's decisions were correct on the merits, and otherwise relies entirely on the argument that defendant failed to properly preserve the purported instructional errors as required by ORCP 59 H[5] and that we, thus, cannot review them.

We begin by clarifying that, notwithstanding defendant's undeveloped argument to the contrary, the alleged instructional errors bear only on defendant's convictions for interfering with a peace officer and not on his convictions for resisting arrest and disorderly conduct. As clarified below, the two disputed instructions both pertain to the

---

[4] The community-caretaking instruction that the court gave reads, in full:

"COMMUNITY CARETAKING

"Any police officer of this state is authorized to perform community caretaking functions. Community caretaking functions include but are not limited to:

"The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:
A. Prevent serious harm to another person or property;
B. Render aid to injured or ill persons;
C. Locate missing person."

[5] At the time of trial, ORCP 59 H(1), which applies in criminal cases under ORS 136.330(2), provided in relevant part as follows:

"A party may not obtain review on appeal of an asserted error by a trial court in * * * giving or refusing to give an instruction to a jury unless the party who seeks to appeal identified the asserted error to the trial court and made a notation of exception immediately after the court instructed the jury."

We note that amendments to ORCP 59 H have since been adopted, but they do not affect our analysis.

lawfulness of the deputies' presence on the Bistrika property and, according to defendant, therefore, the lawfulness of their orders. Those factors are only potentially relevant with regard to ORS 162.247, which required the state to prove, as the jury was instructed, that defendant refused "to obey a lawful order" of a peace officer. By contrast, neither resisting arrest nor disorderly conduct requires proof of such an element. *See* ORS 162.315(3) ("It is no defense to a prosecution [for resisting arrest] that the peace officer * * * lacked legal authority to make the arrest or book the person, provided the officer was acting under color of official authority."); ORS 166.025 (stating elements of second-degree disorderly conduct).

With that in mind, we turn to the relevant facts, which are procedural and undisputed. Defendant first objected to the state's proffered community-caretaking instruction following the close of the state's case. The state defended its proposed instruction as "the only guidepost" for "the jury * * * to know what a lawful order is[.]" Before closing arguments, the court and counsel for all parties discussed the proposed jury instructions. The following colloquy took place:

"[DEFENSE COUNSEL]: Then, we also would like the Court to give our special instruction on the emergency aid doctrine. And the language that we've used in that instruction is taken specifically from the Court's order on June 24th, at page 2, in which the Court found that, once the emergency had dissipated, the deputies were no longer lawfully on the property. And that, it seems to me, is the law of the case.

"THE COURT: I'm going to let the jurors make a determination with regard to the facts on that. Okay?

"[DEFENSE COUNSEL]: Finally, Your Honor, we object to the instruction concerning community caretaking. That's an inaccurate and incomplete statement of the law, we believe, because there is no basis for the community caretaking statute to come into play, unless the emergency aid doctrine is a valid exception to the warrant requirement before that.

"And the State's conceded that in page 3 of its response to our motion to suppress, in which the State says, 'This community caretaking statute does not create an independent exception to the warrant requirement of Article I, Section 9. Instead, an established exception to the warrant requirement must apply before the police activity under ORS 133.033 is lawful.'

"So the statement of the statute is incomplete, and we would first ask that it not be given. But if it is given, then it should be clarified to require, first of all, that an exception to the warrant requirement be found prior to invoking the community caretaking exception, in other words, the community caretaking statute."

The court and defendant continued to discuss the propriety of the state's proposed community-caretaking instruction at some length. Following that discussion, the state again advocated for its instruction on the basis that no statute defines what constitutes a "lawful" order and "the community caretaking statute * * * [is one of] the clearest definitions of what a lawful order could be in this case."

In closing argument, the state argued that the deputies arrived at the property in response to an emergency call and remained on the premises after defendant appeared unharmed and requested that they leave, because they needed to perform a community-caretaking investigation— "to find out, is somebody seriously injured? Is there property damage? Is there somebody missing?"

Defendant argued to the jury that the community-caretaking statute did not give the deputies authority to give orders in this case, that "there were no reasons for the officers to remain on the property" once defendant appeared unharmed, and that the deputies' subjective belief to the contrary was irrelevant. Defendant also asserted that it was up to the jurors to decide whether the deputies "were giving lawful orders that day."

In rebuttal, the state argued that the deputies were conducting community-caretaking functions when they entered the property and throughout their interactions with defendant and his family, including when giving orders to defendant:

"Defense counsel says, it's all over. They get there, they find defendant * * *. Their community caretaking responsibilities are over. But that is not true.

"After a minute to a minute and a half, they still have this hysterical woman, who, by the way, has called them to the location * * *.

"And then, they made a big deal about your constitutional rights to tell them to leave. This isn't a criminal case. They don't need a warrant to go there. They're not investigating a drug case. They don't need a search warrant. This is community caretaking.

"They have, not a right, but they have a community obligation to go to that residence under the community caretaking statute. They have not only a right, they have a duty.

"They are required to go there. They are required on that call to find out, is there an injury to persons? Is there injury to property? Is there somebody missing? The defendant wants you to believe, after a minute or a minute and a half, they should just leave * * *.

"* * * * *

"They have an obligation and a duty to give orders, and tell people what to do, if they're interfering, so that they can conduct the investigation.

"* * * * *

"The police have an obligation, a legal duty, to go out there and give orders, and make requests, and tell people what to do, and take statements to find out what is going on when they are in this kind of a situation (unintelligible).

"* * * * *

"Defendants immediately interfered with what the police were doing. They have a call. Somebody who's drunk was in the water. An hysterical caller. And they have a legal obligation to go find out what's going on.

"And within a minute and a half, people are yelling all over them, yelling at them, screaming at them, preventing them from doing that * * *.

"And eventually, they had to take action. They had to take action, because these people were interfering with what they were doing, and they were creating a threat."

Following the parties' closing arguments, the court instructed the jury. After delivering general instructions, the judge provided instructions for the charges against each of the defendants in turn, listing the elements for each offense. Regarding defendant, the court delivered Uniform Criminal Jury Instruction 1240, regarding ORS 162.247(1)(b), tailored to the facts on each count:

"Interfering with a peace officer, a person commits that crime of interfering with a peace officer, if the person, knowing that another person is a peace officer, intentionally refuses to obey a lawful order by the peace officer.

"To establish the offense of interfering with a peace officer, the State must prove the following four elements. One, that the act occurred in Marion County, Oregon. Two, that the act occurred on or about July 25, 2009.

"And three, that [defendant] intentionally refused to obey a lawful order by the peace officer. And four, that [defendant] knew that [deputy's name] was a peace officer."

That instruction did not elaborate on the meaning of "lawful order," nor did any other. Defendant had requested a special instruction on interfering with a peace officer that focused on the "lawful order" element, which the court declined to give, and he does not assign error to that ruling. By contrast, the court did provide an instruction defining "peace officer," as well as additional instructions elaborating on elements of the crimes of resisting arrest and disorderly conduct. The court also delivered the state's requested community-caretaking instruction verbatim.

The court then excused the jury to deliberate and the following exchange took place:

"THE COURT: [Counsel for defendant's sister, Svetlana], on behalf of Defendant Svetlana Bistrika, aside from what was done before closing argument, do you take any further exceptions to the instructions?

"[COUNSEL FOR SVETLANA]: No, Your Honor.

"THE COURT: Same to you.

"[DEFENSE COUNSEL]: No, Your Honor.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: No further."

We consider the preservation issue first. In light of the Supreme Court's recent opinion in *State v. Vanornum*, 354 Or 614, 631, 317 P3d 889 (2013) (holding that "ORCP 59 H does not set the standard by which the appellate courts will determine if a claim of instructional error is preserved"), we reject the state's argument that defendant failed to comply with Rule 59 H without further discussion. *See State v. Gray*, 261 Or App 121, 125-30, 322 P3d 1094 (2014) (discussing *Vanornum*). Instead, we look to this court's normal preservation jurisprudence to determine whether defendant sufficiently preserved his claims of instructional error. *Vanornum*, 354 Or at 631. The determination whether a particular issue was preserved for appeal is a practical one and depends on whether the policies behind the preservation requirement are met in an individual case. *State v. Whitmore*, 257 Or App 664, 666, 307 P3d 552 (2013). "Those policies ensure that trial courts have an opportunity to understand and correct their own possible errors and that the parties are not taken by surprise, misled, or denied opportunities to meet an argument." *Vanornum*, 354 Or at 632 (internal quotation marks omitted). We will thus review an issue advanced by a party on appeal as long as that party "provide[d] the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately." *Id.* (internal quotation marks omitted). We conclude that defendant did so here.

With regard to the state's requested community-care-taking instruction, the trial court delivered that instruction following defendant's express objection and after a lengthy conversation in which defendant asserted that it was "an inaccurate and incomplete statement of the law," because it failed to clarify that there was "no basis for the community caretaking statute to come into play," unless "an exception to the warrant requirement [was] found * * *." And, as noted above, defendant argued in the same colloquy that, without an exception to the warrant requirement, the deputies' presence and "activity" after the emergency dissipated was not lawful. That was sufficient to preserve defendant's argument on appeal that delivery of the state's instruction

impermissibly encouraged the jury to vest additional weight in the lawfulness of the deputies' actions. Because defendant's argument regarding the community-caretaking instruction rests primarily on his view of the interaction between the community-caretaking statute and application of the emergency-aid doctrine, we conclude that defendant's argument regarding the former sufficiently articulated his argument regarding the latter. Given the additional fact that the parties and the court also thoroughly discussed the applicability of the emergency-aid doctrine before the same judge in the context of the pretrial hearing on defendant's motion to suppress, we have no doubt that defendant sufficiently preserved his argument regarding his requested instruction.[6]

We turn now to the merits of defendant's claims. On appeal, defendant renews his argument that the court erred in refusing to give his requested emergency-aid instruction because it was a correct statement of law and "correct under the law of the case," and because it placed the "lawfulness of the deputies' ongoing presence on the property where it belongs—in the hands of the court." Defendant also renews the argument that the trial court erred further by providing the state's requested instruction because the community-caretaking statute did not authorize the deputies to remain on the Bistrika property after the objective factual basis for the emergency-aid exception dissipated. According to defendant, because the community-caretaking instruction did not include the constitutional standard, it was erroneous as a matter of law and misleading by omission. As a result, defendant argues, the erroneous instruction encouraged the jury to find that the deputies were lawfully on the property at all times and, thus, that the orders that defendant refused to obey were "lawful."

We review for legal error. *State v. Barnes*, 329 Or 327, 333, 986 P2d 1160 (1999). A trial court commits reversible error when it incorrectly instructs the jury on a material element of a claim or defense and that instructional error,

---

[6] Defendant's requested instruction may have sufficed by itself to preserve the argument contained within it. *See Vanornum*, 354 Or at 632 n 11 ("[T]he terms of a requested, but refused, instruction may sometimes go a long way to putting a trial court on notice of the deficiency in the trial court's instructions if the requested instruction is not given.").

in light of the other instructions given, permits the jury to reach a legally erroneous result. *Wallach v. Allstate Ins. Co.*, 344 Or 314, 326, 329, 180 P3d 19 (2008). Instructional error exists where the instructions give the jury "an incomplete and thus inaccurate legal rule" to apply to the facts, *id.* at 325, or where the instructions insert an irrelevant issue into the jury's deliberations concerning a material issue, *see State v. Oliphant*, 347 Or 175, 194, 218 P3d 1281 (2009) (trial court erred by introducing the question of an arresting *officer's* state of mind where the defendant in a prosecution for, *inter alia*, resisting arrest, claimed self-defense, which turns on the *arrestee's* state of mind). In assessing instructional error, we look not only to the other instructions given, but to the contentions of the parties at trial as well. *Vandeveere-Pratt v. Portland Habilitation Center*, 242 Or App 554, 565, 259 P3d 9 (2011).

Based on the record and rules cited above, we hold that the trial court committed reversible error when it delivered the state's requested community-caretaking instruction, because that instruction inserted an irrelevant issue into the jury's deliberations that permitted the jury to reach a legally erroneous result. That instruction—in light of the other instructions given and, especially, in light of the state's arguments to the jury—represented the only compass that the jury, which had been expressly charged with determining the lawfulness of the deputies' orders, was given to help it navigate that inquiry. However, as discussed above in our analysis of defendant's other assignments of error, 261 Or App at 714-18, the lawfulness of the deputies' orders in this case turned *not* on the lawfulness (or lack thereof) of the deputies' presence, but rather on whether defendant's conduct reasonably led the deputies to feel threatened and thereby prompted the orders.

Nevertheless, and as our excerpt of the state's closing and rebuttal arguments demonstrates, the state asserted to the jury that the community-caretaking statute authorized not only the deputies' initial arrival at the Bistrika property, but also their continued presence after defendant asked them to leave. More to the point, the state invoked the community-caretaking statute as the source of the deputies'

authority to give the orders underlying defendant's convictions for interfering with a peace officer and thereby suggested to the jury that the orders to defendant were lawful. In rebuttal to defendant's contention that the community-caretaking statute did not give the deputies authority to give those orders and that it was up to the jurors to decide whether the deputies "were giving lawful orders that day[,]" the state told the jury to disregard the defense argument that, once defendant arrived, the "community caretaking responsibilities are over" and flatly stated that the defense argument "is not true." The prosecutor gave the jury the impression that all of the conduct by the deputies that night involved community caretaking, stating that "[t]his is community caretaking" and that the deputies

> "are required to go there. They are required on that call to find out, is there an injury to persons? Is there injury to property? Is there somebody missing? The defendant wants you to believe, after a minute or a minute and a half, they should just leave * * *.

> "* * * * *

> "It's their obligation. They have an obligation and a duty to give orders, and tell people what to do, if they're interfering, so that they can conduct the investigation."

Immediately following the state's rebuttal, the court instructed the jury that, to find defendant guilty of interfering with a peace officer, it had to find that, among other things, defendant refused to obey "lawful" orders. However, it provided no instruction regarding how to determine whether or not the relevant orders were lawful. Given that instructional "vacuum," as defendant argues on appeal, the state was able to use the community-caretaking instruction to imbue all of the deputies' conduct, including their orders, with the lawfulness of their entry and their apparent continuing authority to remain on the property to conduct community caretaking. Indeed, the state itself twice asserted to the court that the community-caretaking statute was necessary for the jury to understand what constituted a lawful order in this case. The instruction permitted the jury to reach the legally erroneous conclusion that, as the state argued, the orders that defendant refused to obey were lawful because

they were given in the course of an investigation authorized, even mandated, by the community-caretaking statute.

Lastly, although it is not necessary to reach defendant's additional claim of instructional error to resolve his appeal, we address that contention briefly because it may arise again on remand. We conclude that the court did not err when it refused to give defendant's requested instruction. Defendant argues that the rejection of his instruction functioned in tandem with the delivery of the state's instruction to impermissibly misdirect the jury's attention away from the dispositive fact that the deputies were unlawfully present on the property at the time they delivered the relevant orders and that, therefore, those orders were unlawful. In other words, according to defendant, his instruction would have cured the defect of the state's instruction by completing it. However, as earlier explained, the state's instruction was not defective because it was incomplete; it was defective because it was inapposite and misleading. Defendant's requested instruction was similarly irrelevant and potentially confusing.

In conclusion, we hold that the trial court properly denied defendant's motion to suppress evidence, as well as defendant's motion for judgment of acquittal on the interfering-with-a-peace-officer and disorderly conduct charges. We also hold that the court properly refused defendant's requested instruction concerning the emergency-aid doctrine. However, we hold that the trial court did commit instructional error when it delivered the state's proffered instruction on community caretaking and that the error was prejudicial. We therefore reverse and remand on the convictions for interference with a peace officer and otherwise affirm.

Convictions for interfering with a peace officer reversed and remanded; otherwise affirmed.