Argued and submitted February 19, 2013, convictions on Counts 1 and 3 reversed and remanded; otherwise affirmed April 23, petition for review denied October 2, 2014 (356 Or 397)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SVETLANA ALEXANDROVNA BISTRIKA,
*Defendant-Appellant.*

Marion County Circuit Court
09C47657; A146754

324 P3d 584

Lindsey K. Detweiler, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Schuman, Senior Judge.

DUNCAN, P. J.

**DUNCAN, P. J.**

This is a criminal case that arose out of the same incidents described in our opinion in *State v. Bistrika*, 261 Or App 710, 711-13, 322 P3d 583 (2014), wherein defendant's mother called for emergency assistance, the responding deputy sheriffs stayed after they were asked to leave, and defendant and her brother, Alexander A. Bistrika (Alexander), her mother, and her father were arrested. Defendant was charged with three counts of interfering with a peace officer (Counts 1-3), ORS 162.247, two counts of resisting arrest (Counts 4-5), ORS 162.315, and one count of disorderly conduct in the second degree (Count 6), ORS 166.025. The four Bistrika family members filed motions to suppress, which the trial court granted with respect to defendant's mother and father and denied with respect to defendant and Alexander.[1] Defendant and Alexander proceeded to trial as co-defendants, and a jury convicted defendant of Counts 1, 3, 4, 5, and 6.

On appeal, defendant raises five assignments of error. In her first assignment of error, she argues that the trial court erred in denying her motion to suppress any evidence obtained after the deputies were asked to leave because (1) at that point, they were on the family property unlawfully and all evidence obtained as a result of their unlawful presence—including evidence of defendant's conduct—was subject to suppression under the exclusionary rule, and (2) defendant's conduct did not threaten officer safety and thus was not admissible under the exception to the exclusionary rule articulated in *State v. Gaffney*, 36 Or App 105, 583 P2d 582 (1978), *rev den*, 285 Or 195 (1979). In her second and third assignments of error, defendant argues that the trial court erred in denying her motions for judgment of acquittal on Counts 1 and 3, interfering with a peace officer, because the state failed to present evidence that would allow a reasonable factfinder to conclude that the deputies were performing lawful duties with respect to another person. In her fourth assignment of error, defendant argues

---

[1] We affirmed without opinion the state's appeal of the trial court's decisions to grant the motion to suppress with respect to defendant's mother and father. *State v. Bistrika/Bistrika*, 247 Or App 766, 274 P3d 315 (2012).

that the trial court erred in denying her motion for judgment of acquittal on Count 6, disorderly conduct in the second degree, because the state failed to present evidence that would allow a reasonable factfinder to find that defendant recklessly created a risk of public inconvenience, annoyance, or alarm. In her final assignment of error, defendant argues that the trial court erred in instructing the jury on the community caretaking functions of peace officers because that instruction was unnecessary, likely to confuse the jury, and irrelevant to the issues in the case.

With respect to defendant's first assignment of error, we conclude that the trial court correctly denied the motion to suppress because, although the emergency dissipated once Lane saw that Alexander was unharmed, the officer safety exception to the exclusionary rule applies to the facts of this case. We conclude that defendant failed to preserve her second and third assignments of error for review. With respect to defendant's fourth assignment of error, we conclude, consistently with our opinion in *Bistrika*, 261 Or App at 719-20, that the state presented sufficient evidence for a rational factfinder to find that defendant recklessly created a risk of public inconvenience, annoyance, or alarm. With respect to defendant's fifth assignment of error, we conclude that the trial court erred in instructing the jury on community caretaking functions. Thus, we reverse and remand the two counts of interfering with a peace officer; otherwise, we affirm.

For purposes of defendant's first assignment of error, we present the facts as adduced at the suppression hearing. *State v. Mazzola (A139257)*, 238 Or App 201, 203, 242 P3d 674 (2010). We defer to the trial court's factual findings as long as there is evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

The single witness at the suppression hearing was Deputy Lane, who testified to the following facts: On July 25, 2009, at approximately 1:50 a.m., defendant's mother placed an emergency call for assistance because she believed that her adult son, Alexander, might have fallen into a creek or pond on the family property. The property is located at the end of a long driveway in a rural area outside Salem. Lane

was the first person to respond. When Lane arrived, he contacted defendant's mother and several other family members. Defendant's mother was "hysterical" and "upset." She showed Lane the pond that she thought her son had entered, and they looked to see if he was in the pond. Shortly thereafter, Deputy Lucca and Alexander appeared at approximately the same time. Alexander was dry and unharmed. He told the officers that he was the person they were looking for, that he had not been in the pond, and that they should "get the fuck off my property." Lucca asked defendant's mother what had prompted her emergency call and why she was still upset.

Defendant arrived and told her mother not to speak with the officers. Defendant told the officers, "Get the fuck off my property." Defendant also tried to pull her mother away from the officers. At that point, Lucca told defendant that she was under arrest for interfering with a peace officer. As Lucca was attempting to arrest her, defendant pulled free and retreated to where five or six of her family members were standing. The family members were upset and were yelling at the officers to leave the property.

Lane called for backup. A short time later, Deputy Hunter arrived. Lane pointed out defendant and told Hunter that she was under arrest. Hunter "was able to get [defendant] away from the family, and placed her into custody." Meanwhile, the other family members were "[y]elling and screaming about why their sister was under arrest" and "trying to get past [Lane] to get to [defendant]."

The prosecutor asked Lane, "What officer safety concerns are there when you are dealing with dividing your attention among multiple subjects?" Lane replied, "Exactly that. It divides my attention. I can't focus on one person and what they're doing."

On cross-examination, Lane testified that, once he saw Alexander, he no longer had any reason to believe that any person on the Bistrika property was in danger. Lane said that he remained on the property after Alexander appeared because he "needed to ensure that he was okay, and that everybody else was okay," and to "[d]etermine if [Alexander]

was a threat to himself or others." However, Lane later acknowledged that he had no information to suggest that Alexander or anyone else on the property was suicidal.

As mentioned, defendant was charged with interfering with a peace officer, ORS 162.247 (Counts 1-3), resisting arrest, ORS 162.315 (Counts 4-5), and disorderly conduct, ORS 166.025 (Count 6). Before trial, Alexander filed a motion to suppress all evidence obtained after the deputies were told to leave the Bistrika property. That motion was joined by defendant, her mother, and her father. The trial court denied the motion with respect to Alexander and defendant and granted it with respect to her mother and father.

In a letter opinion dated May 17, 2010, the court ruled that the deputies were lawfully on the Bistrika property as a result of defendant's mother's request for emergency assistance. The court further ruled that, once Lane saw that Alexander was unharmed, "the search was no longer necessary," but that Lane was still authorized to remain on the property to confirm that Alexander was the person he said he was, and to ask defendant's mother additional questions to determine why she remained hysterical. According to the court, Alexander and defendant were "clearly a direct threat to the officers at the scene and hostile from the start."

The state filed a motion for reconsideration, arguing that the court should have denied the motion to suppress with respect to all four defendants. The court wrote a second letter opinion, dated June 24, 2010, adhering to its earlier decision and clarifying its reasoning:

> "The court did find that the deputies were lawfully on the property pursuant to the emergency aid doctrine. What the court failed to make clear was that * * * once Alexander A. Bistrika was found unharmed and safe, [the] emergency had dissipated and the deputies were no longer lawfully on the property pursuant to the emergency doctrine.

> "However, as the State points out, courts will not apply the exclusionary rule to evidence of a new crime after an unlawful stop, arrest, or search if there is a threat to the officer's safety. *State v. Janicke*, 103 Or App 227, 796 P2d 392 (1990). Thus, once the emergency dissipated, any

subsequent evidence may not be excluded if the State can show that the subsequent crime led to a threat to the deputies' safety.

"The State has not met this burden with regard to [defendant's father] and [defendant's mother]. There was no showing that either of these [defendants] threatened the safety of the deputies."

Defendant was subsequently tried by a jury and convicted of two counts of interfering with a peace officer, two counts of resisting arrest, and one count of disorderly conduct. Defendant was acquitted of one count of interfering with a peace officer. This appeal followed.

On appeal, defendant asserts that, although Lane and the other deputies were "[a]rguably" permitted to enter the Bistrika property under the emergency aid exception to the warrant requirement, "once Lane observed the pond, did not see any evidence of a drowning person, and Alexander appeared dry and unharmed, any potential emergency completely dissipated." According to defendant, the officers' continued presence on the property, with no justification for staying and after family members had asked them to leave, constituted an unlawful search. Thus, argues defendant, all evidence obtained as a result of that search must be suppressed. Defendant acknowledges that, in *Gaffney*, 36 Or App at 108-09, and other cases, we have declined to suppress evidence of independent crimes that threatened officer safety, even if the officer was acting illegally. According to defendant, however, that exception is inapplicable because defendant's conduct did not threaten the officers' safety.

In response, the state makes two arguments. First, the state argues that, even if the emergency dissipated after the officers observed that Alexander was uninjured, evidence of defendant's "hostile, unpredictable, and defiant behavior" is still admissible under the officer safety exception because defendant's conduct threatened the officers' safety. The state asserts that, because the trial court made a factual finding that defendant's actions constituted a threat to officer safety, and that finding is supported by evidence in the record, that finding is binding on this court. In the alternative, the state argues that, contrary to the trial court's

conclusion, the emergency did not dissipate when the officers saw Alexander, and, thus, the officers were lawfully present when they observed defendant's crimes, and evidence of those crimes was not subject to suppression. According to the state, the officers "were not simply required to take defendant's brother at his word; they were authorized to remain long enough to verify his story," particularly because defendant's mother, who had made the initial call for assistance, remained hysterical even after seeing her son.

We review a trial court's ruling on a motion to suppress for errors of law. *State v. Warner*, 181 Or App 622, 624, 47 P3d 497, *rev den*, 335 Or 42 (2002).

A search occurs under Article I, section 9, of the Oregon Constitution when "a person's privacy interests are invaded." *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). "[A]bsent evidence of an intent to exclude, an occupant impliedly consents to people walking to the front door and knocking on it, because of social and legal norms of behavior." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995). In contrast, a person does not impliedly consent to entry onto his or her private property other than to approach the front door. *State v. Pierce*, 226 Or App 336, 343-49, 203 P3d 343 (2009); *State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den*, 298 Or 334 (1984).

Article I, section 9, prohibits warrantless searches and seizures unless the circumstances satisfy one of the established exceptions to the warrant requirement. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). The state bears the burden of establishing that the circumstances fall under one of those exceptions. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983).

Under the emergency aid doctrine, law enforcement officers may lawfully enter private premises without a warrant if they "have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011) (footnotes omitted).

Consistently with our opinion in *Bistrika*, 261 Or App at 714, we conclude that defendant's mother's phone call authorized the officers' initial presence on the Bistrika property under the emergency aid exception to the warrant requirement. The officers subjectively believed they needed to enter the property to assist Alexander, whom they believed had suffered or was imminently threatened with serious physical injury or harm, and their belief was objectively reasonable because they were responding to an emergency call for assistance in which defendant's mother, who was extremely distraught, stated that she thought that Alexander had fallen into a pond on the family property. After Lane saw that no one was in the pond and a man identifying himself as Alexander told Lane that he was fine, Lane did not have objectively reasonable grounds to believe that the deputies needed to remain "to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *Baker*, 350 Or at 649 (footnotes omitted). At that point, the emergency had dissipated, and Lane was no longer authorized to be on the Bistrika property.

The state contends that the emergency "did not dissipate simply because some unknown person arrived on the scene, claimed to be the person reportedly in danger, and said there was no emergency, particularly when the 911 caller [defendant's mother] remained hysterical after that person's arrival." In the absence of any articulable facts suggesting that Alexander was not, in fact, the person he claimed to be, it was not reasonable for Lane to continue to believe that an emergency was in progress. Although the fact that defendant's mother remained upset after seeing that Alexander was unharmed could suggest that the concern that prompted her phone call had not been resolved, that did not give Lane reasonable grounds to believe that an emergency was in progress that required his immediate aid. Thus, the state failed to show that Lane had an objectively reasonable belief that an emergency existed after he saw that Alexander was unharmed.[2]

---

[2] The state argues that our decision will lead to the "intolerable" result that "officers responding to a 911 call that a man is beating his wife would be required to leave immediately when someone claiming to be the wife or husband arrives

Absent an applicable exception, evidence obtained as a result of unlawful police activity is subject to suppression. *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005); *State v. Warner*, 284 Or 147, 166, 585 P2d 681 (1978). However, as we have explained in a line of cases beginning with *Gaffney*, 36 Or App at 108-09, evidence of independent crimes that threaten officer safety need not be suppressed, even when that evidence was obtained as a result of unlawful police conduct, such as an unlawful search.[3] In *Gaffney*, officers stopped the defendant on the sidewalk. One of the officers began to pat down the defendant for weapons, and, in response, the defendant allegedly shoved the officer. We held that, although the officers had stopped the defendant without reasonable suspicion, evidence of the defendant's subsequent conduct was nevertheless admissible:

> "The purposes underlying the exclusionary rule would not be well served by the exclusion of evidence of independent crimes directed at officers who illegally stop, frisk, arrest or search. Moreover, the results of such an extension of the exclusionary rule would be intolerable. A person who correctly felt that he had been illegally stopped, for example, could respond with unlimited violence and under an

and says everything is fine." Although that result would indeed be intolerable, our decision will not lead to it. If an officer responding to a 9-1-1 call that a husband is beating his wife encounters someone claiming to be the wife or husband who says that everything is fine, the officer may stop and question the person if the officer has reasonable suspicion that the person is either a potential material witness to a crime or a criminal suspect. *State v. Fair*, 353 Or 588, 603, 608-09, 302 P3d 417 (2013); *State v. Cloman*, 254 Or 1, 6, 456 P2d 67 (1969). In the absence of reasonable suspicion or some other sufficient justification, however, the officer may not detain the person for questioning simply to satisfy the officer's curiosity. *See State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010) (a stop is "a type of seizure that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity").

[3] The state argues that the question whether a person's actions threaten officer safety is a question of fact. That is incorrect. The "determination of what actually happened"—that is, which actions defendant took—is a question of fact that is binding upon this court if there is evidence in the record to support it. *Davis*, 295 Or at 238. However, the determination of whether those actions posed a threat to the officers' safety is a question of law, which we review for errors of law. *See State v. Amell*, 230 Or App 336, 341, 215 P3d 910 (2009) (in the context of the officer safety exception to Article I, section 9, distinguishing between trial court's factual findings and whether those findings satisfied the relevant legal standard).

exclusionary rule be immunized from criminal responsibility for any action taken after the stop. That cannot be an appropriate rule."

*Id.*

We applied the same principle in *State v. Janicke*, 103 Or App 227, 796 P2d 392 (1990), in which the defendant, who had been involved in a traffic accident, refused to identify himself or show his license to a police officer. The police obtained his name and address and went to his house. The officers followed the defendant inside his house, and a struggle ensued, resulting in charges of assault, harassment, and resisting arrest. We held that the trial court had erred in suppressing evidence of the altercation because, even assuming, without deciding, that the officers' entry into the house was unlawful, "we have declined to extend the exclusionary rule to evidence of crimes committed against police officers during what turns out to be an illegal stop or entry." *Id.* at 230.

In contrast, we declined to apply the officer safety exception in *State v. Williams*, 161 Or App 111, 984 P2d 312 (1999). In that case, an officer arrested the driver of a car. While conducting an inventory of the car in preparation for towing, the officer found a loaded gun underneath the front passenger seat, where the defendant had been sitting. The officer then arrested the defendant for unlawful possession of the weapon. When the defendant was searched during booking, the police discovered 10 baggies of marijuana in his shoe, for which he was charged with supplying contraband. The trial court granted the defendant's motion to suppress evidence of the marijuana, holding that the officer lacked probable cause to arrest the defendant and that the discovery of the marijuana was not attenuated from the arrest. The state appealed, and we affirmed the trial court, concluding that the officer lacked probable cause to arrest the defendant and that evidence of the marijuana was not admissible under the officer safety exception. We explained that the *Gaffney* line of cases was "inapposite" because "[t]he crucial fact in those cases was that the new crime was directed at the arresting officers, thereby threatening their safety." *Id.* at 119. "The rationale underlying our denial of suppression in those cases" was absent because

"[t]he presence of the concealed marijuana did not threaten the officer's safety in any way." *Id.* at 120.

In *State v. Neill*, 216 Or App 499, 173 P3d 1262 (2007), *rev den*, 344 Or 671 (2008), our most recent application of the officer safety exception, the defendant's son called 9-1-1 to report a potential domestic abuse situation involving the defendant and her boyfriend. When officers arrived at the defendant's apartment and attempted to locate her boyfriend, she disobeyed their orders to sit down and not to move. As the officers were escorting her boyfriend away, the defendant began yelling at the officers, jumped up, and ran down the hallway toward the bedroom. Although an officer attempted to restrain her, the defendant dove under the bed. One officer testified that she suspected that the defendant was reaching for a weapon. We held that, "even assuming that the officers entered defendant's home unlawfully, the trial court correctly admitted evidence of her refusal to obey the officers' orders" because her refusal "reasonably led the officers to be concerned that defendant posed a legitimate threat to their safety and to their ability to maintain control of a potentially dangerous situation." *Id.* at 508.

Applying the officer safety exception to this case, we hold that, when defendant pulled away from Lucca's attempt to arrest her and took cover in a crowd of family members who were upset and yelling at the officers, it became reasonable for the officers "to be concerned that defendant posed a legitimate threat to their safety and to their ability to maintain control of a potentially dangerous situation." *Neill*, 216 Or App at 508. In fact, Lane testified that those circumstances prompted him to call for additional patrol units. Thus, the officer safety exception to the exclusionary rule applies to evidence of defendant's conduct in pulling away from Lucca's attempt to arrest her and joining a hostile crowd of family members.

There is no indication in the record that the motion to suppress that defendant joined was anything other than a general motion to suppress all evidence that the officers discovered after entering the Bistrika property. Thus, because the trial court did not err in denying defendant's motion to suppress with respect to evidence that defendant pulled

away from Lucca and joined a crowd of hostile family members, we conclude that the trial court did not err in denying defendant's motion to suppress as a whole.

We turn to defendant's second and third assignments of error, in which she asserts that the trial court erred in denying her motions for judgment of acquittal on Counts 1 and 3, interfering with a peace officer (IPO). ORS 162.247 defines the crime of IPO:

"(1)   A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer or a parole and probation officer as defined in ORS 181.610:

"(a)   Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person; or

"(b)   Refuses to obey a lawful order by the peace officer or parole and probation officer.

"(2)   Interfering with a peace officer or parole and probation officer is a Class A misdemeanor.

"(3)   This section does not apply in situations in which the person is engaging in:

"(a)   Activity that would constitute resisting arrest under ORS 162.315; or

"(b)   Passive resistance."

The amended information alleged that defendant "did unlawfully and intentionally attempt to prevent" deputies Lucca, Hunter, and Lane "from performing the officer's lawful duties with regard to another person." That is, the state charged defendant with violating subsection (1)(a) of the IPO statute. In contrast, the amended information against Alexander alleged that he "did unlawfully and knowingly refuse to obey a lawful order of" deputies Lucca, Hunter, and Lane. That is, the state charged Alexander with violating subsection (1)(b) of the IPO statute.

After the close of the state's case-in-chief, Alexander moved for judgment of acquittal on the resisting arrest, disorderly conduct, and IPO charges. Alexander argued that

the state's evidence was insufficient to prove any of the three counts of IPO. With respect to Lane, Alexander's attorney argued, "I don't believe there's any testimony that * * * Lane gave my client any orders whatsoever." With respect to Hunter, Alexander's attorney argued, "There was testimony that Hunter gave orders, but those orders were more along the lines of the resisting arrest type orders. * * * [T]he interfering statute has a specific exception with regard to resisting aspects." With respect to Lucca, Alexander's attorney argued that the orders that Lucca gave defendant were not lawful. That is, in arguing that there was insufficient evidence to prove that he interfered with a peace officer, Alexander argued that none of the officers gave him "lawful order[s]," as required by ORS 162.247(1)(b).

Defendant expressly joined in Alexander's motions for judgment of acquittal and made further argument specific to her case. With respect to Hunter and Lane, defendant argued that "there simply has been no evidence for the Court to look at, even in the light most favorable to the State, that there were any orders given to [defendant], lawful or otherwise, that she disobeyed." With respect to Lucca, defendant reiterated Alexander's argument that the orders given by Lucca were not lawful.

After defendant's arguments, the state conceded that it had not presented sufficient evidence for a reasonable jury to conclude that defendant had committed Count 2. The trial court accepted the state's concession on Count 2 with respect to defendant, which related to interfering with Hunter, and otherwise denied the motions for judgment of acquittal with respect to defendant.

On appeal, in her second assignment of error, defendant argues that the trial court erred in denying her motion for judgment of acquittal on Count 1 because the state failed to establish that Lucca had any lawful duties to perform toward any members of the Bistrika family once the alleged emergency was resolved. In her third assignment of error, defendant argues that the trial court erred in denying her motion for judgment of acquittal on Count 3 because the state "failed to even identify any action that Lane took with respect to another person, let alone a lawful duty toward that individual."

The state responds that defendant failed to preserve her second and third assignments of error because, at trial, she challenged the sufficiency of the evidence of resisting under subsection (1)(b)—"[r]efus[ing] to obey a lawful order" of a peace officer—but she was charged under, and her second and third assignments of error challenge the sufficiency of the evidence under, subsection (1)(a)—preventing or attempting to prevent a peace officer "from performing the lawful duties of the officer with regards to another person." The state also argues that defendant's argument fails on the merits because the state presented evidence from which a rational jury could find that Lucca and Lane were performing lawful duties with respect to members of the Bistrika family.

Upon reviewing the record, we conclude that defendant failed to preserve her second and third assignments of error for review. The requirement of preservation serves several goals, including fairness to opposing parties, full development of the record, and judicial efficiency at both the trial and appellate levels. *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008). "[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). "A challenge to the sufficiency of the evidence must be preserved to be considered on appeal, unless it is plain error." *State v. Paragon*, 195 Or App 265, 268, 97 P3d 691 (2004). "The motion [for judgment of acquittal] must state the specific theory on which the state's proof was insufficient." *Id.*

Here, the theory that defendant presented to the trial court—that the state had presented no evidence that any officers had given defendant a "lawful order"—differed substantively from the theory that defendant presents on appeal—that the state presented no evidence that the officers were performing "lawful duties" with respect to other people. Because defendant failed to alert the trial court to the contentions she now raises on appeal, she denied the trial court the opportunity to consider its alleged error and correct it, if warranted. *See Wyatt*, 331 Or at 343. Defendant

therefore failed to preserve her second and third assignments of error for review.

We turn to defendant's fourth assignment of error, that the trial court erred in denying her motion for judgment of acquittal on Count 6, disorderly conduct in the second degree. The information charged defendant with violating ORS 166.025(1)(a), which provides:

"(1) A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"(a) Engages in fighting or in violent, tumultuous or threatening behavior[.]"

In reviewing a ruling on a motion for judgment of acquittal, we view the evidence presented at trial in the light most favorable to the state to determine whether a rational factfinder could find that the state proved every element of the offense beyond a reasonable doubt. ORS 136.445; *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). At trial, Wineman, a battalion chief and paramedic shift commander with the Marion County Fire Department who arrived at the Bistrika property in response to defendant's mother's request for emergency assistance, described the area surrounding the Bistrika property as "partially wooded, and what we refer to as a urban interface, where there's a—a brush and tree mix with some—what we call urban sprawl, homes popping up." Wineman also testified that the distance from State Street, which forms the southern border of the property, to the location from which Wineman observed the interaction between the Bistrika family and the officers, was "no more than a couple hundred yards." Wineman testified as follows regarding the noise level at the Bistrika property:

"[STATE]: Could you describe the noise level while all of this was going on?

"[WINEMAN]: Where we were at, it actually wasn't—wasn't too bad for us. Most of the—the altercation was happening on the side of the driveway. It's a very rural, country setting.

"There was a couple of vehicles in the driveway that are still running, and that's probably the biggest ambient noise that was out there, other than the yelling that was occurring between the officers and the Defendants.

"[STATE]:  So people were yelling? It was pretty loud, the screaming and yelling?

"[WINEMAN]: The—the screaming and yelling was—was certainly loud, absolutely.

"[STATE]:  Something that could be heard around the neighborhood?

"[WINEMAN]:  I would—I would think so."

At trial, Lane testified as follows with respect to the noise level at the Bistrika property:

"[STATE]:  What [was] the level of noise that was going on with all of this happening?

"[LANE]:  There was a lot of yelling and screaming.

"[STATE]:  Would you characterize it as loud?

"[LANE]:  Yes, it was loud.

"[STATE]:  And is it something that, on a warm day, in kind of a loosely residential area, on a hot day, people have their windows open? This is the kind of thing that they would hear, and would disturb them?

"* * * * *

"[LANE]:  Yeah, it could have—noise carries louder at—at nighttime. There's not as many cars on the road that would—going to deafen the noise."

After the close of the state's case, Alexander moved for judgment of acquittal on disorderly conduct, arguing, *inter alia*, that the state had not proffered sufficient evidence to show that he had recklessly created a risk of *public* inconvenience, annoyance, or alarm. Defendant joined in the motion for judgment of acquittal on disorderly conduct, but made no additional arguments with respect to that count. The court denied the motion. As mentioned, the jury found defendant guilty of disorderly conduct.

On appeal, defendant concedes that she engaged in tumultuous behavior, but argues that the state "failed to prove that defendant recklessly created a risk of public inconvenience, annoyance or alarm." Specifically, defendant argues that the state's evidence was insufficient to support a finding that any members of the public were close enough to hear the altercation, let alone that they were inconvenienced, annoyed, or alarmed by it. In addition, defendant argues that her conduct was not severe enough to create *any* risk of public inconvenience, annoyance, or alarm.

The state responds that there was evidence from which a reasonable jury could have found that defendant recklessly created a risk of public inconvenience, annoyance, or alarm. According to the state, the property was not so rural that, as a matter of law, defendant's conduct posed no risk of public inconvenience, annoyance, or alarm. In addition, argues the state, a jury could have found that defendant's actions created a risk of inconveniencing, annoying, or alarming the Bistrika family, who are members of the public.

Consistently with our opinion in *Bistrika*, 261 Or App at 720, we conclude that a rational factfinder could find that defendant recklessly created a risk of inconveniencing, annoying, or alarming the Bistrikas' neighbors. As mentioned, Wineman and Lane testified that defendant and Alexander were yelling and screaming loudly. According to Lane, the area surrounding the Bistrika property is mixed farm and residential use, with homes, shops, and farm buildings nearby. According to Wineman and Lane, the neighbors "would" or "could" have heard defendant yelling. A rational factfinder could infer from that testimony that Wineman and Lane, who were on the Bistrika property during the incident in question, thought that the Bistrikas' neighbors could have been, or actually had been, inconvenienced, annoyed, or alarmed by defendant's conduct. Thus, viewing the evidence in the light most favorable to the state, a rational factfinder could find that the neighboring houses were close enough to the Bistrika property that defendant recklessly created a risk that she would inconvenience, annoy, or alarm the neighbors, who were likely inside their houses at the time. Therefore, the trial court did not err in denying

defendant's motion for judgment of acquittal on Count 6, disorderly conduct in the second degree.

In defendant's fifth and final assignment of error, she asserts that the trial court erred when, over her objection, it delivered the state's requested instruction stating that police officers are authorized to perform community caretaking functions and listing several examples of permissible functions. Defendant argues that the community caretaking instruction was unnecessary, irrelevant, and likely to confuse the jury. The state responds that defendant failed to preserve her assignment of error because she did not except to the jury instructions after they were given, as required by ORCP 59 H(1).

The relevant facts are procedural and undisputed. Before closing arguments, the parties discussed their proposed jury instructions with the court. The state requested a special jury instruction concerning community caretaking functions, based on ORS 133.033. Alexander objected to that instruction, asserting that it was "an inaccurate and incomplete statement of the law, we believe, because there is no basis for the community caretaking statute to come into play, unless the emergency aid doctrine is a valid exception to the warrant requirement before that." Defendant adopted Alexander's argument.[4] The court overruled Alexander's objections.

In closing argument, the state argued that the officers remained on the property after Alexander appeared unharmed and requested that they leave because they had a duty to perform a community caretaking investigation: "[Lane is] there on a community caretaking (unintelligible). He's there to find out, is somebody seriously injured? Is there property damage? Is there somebody missing?" In rebuttal, the state argued that the officers were engaging in community caretaking functions when they entered and remained on the property:

> "Defense Counsel says, it's all over. They get there, they find [Alexander]. Their community caretaking responsibilities are over. But that is not true.

---

[4] Alexander requested a special jury instruction regarding the emergency aid exception, and defendant also joined in that request. The trial court denied Alexander's requested jury instruction regarding the emergency aid exception.

"* * * * *

"* * * This isn't a criminal case. They don't need a warrant to go there. They're not investigating a drug case. They don't need a search warrant. This is community caretaking.

"They have, not a right, but they have a community obligation to go to that residence under the community caretaking statute. They have not only a right, they have a duty.

"They are required to go there. They are required on that call to find out, is there an injury to persons? Is there an injury to property? Is there somebody missing? * * *

"* * * * *

"* * * They have an obligation and a duty to give orders, and tell people what to do, if they're interfering, so that they can conduct the investigation.

"* * * * *

"The police have an obligation, a legal duty, to go out there and give orders, and make requests, and tell people what to do, and take statements to find out what is going on when they are in this kind of a situation (unintelligible)."

After closing arguments, the court instructed the jury. The court first delivered general instructions, and then provided instructions for the charges against each defendant, listing the elements for each offense. With respect to defendant, the court delivered Uniform Criminal Jury Instruction 1240, tailored to the facts on each count of interfering with a peace officer, ORS 162.247(1)(a):

"A person commits the crime of interfering with a peace officer if the person, knowing that another person is a peace officer, intentionally acts in a manner that prevents or attempts to prevent a peace officer from performing the lawful duties of the peace officer with regard to another person.

"To establish the offense of interfering with a peace officer, the State must prove the following four elements. One, that the act occurred in Marion County, Oregon. Two, that the act occurred on or about July 25, 2009.

"Three, that [defendant] intentionally acted in a manner that prevented or attempted to prevent a peace officer

from performing the lawful duties of the peace officer with regard to another person. Four, that [defendant] knew that [the deputy] was a peace officer."

No instruction elaborated on the meaning of "lawful duties." The court also delivered the state's requested community caretaking instruction to the jury:

"Any peace officer or any police officer of this state is authorized to perform community caretaking functions. The community caretaking functions include, but are not limited to, the right to enter or remain upon the premises of another, if it reasonably appears to be necessary to (a) prevent serious harm to another person or property, (b) render aid to injured or ill persons, (c) locate missing persons."

Before turning to the merits, we briefly address the state's argument that defendant failed to preserve her fifth assignment of error because she did not except to the jury instructions after they were given. After the briefing in this case was complete, the Supreme Court decided *State v. Vanornum*, 354 Or 614, 631, 317 P3d 889 (2013), in which it held that "ORCP 59 H does not set the standard by which the appellate courts will determine if a claim of instructional error is preserved. Instead, preservation must be determined by this court's preservation jurisprudence." Alexander objected to the community caretaking instruction before it was given, arguing that "there is no basis for the community caretaking statute to come into play, unless the emergency aid doctrine is a valid exception to the warrant requirement before that." Defendant joined in Alexander's argument. After the court instructed the jury, the court asked whether defendant wished to take any additional exceptions, and defendant responded that she did not. We conclude that Alexander's exception, in which defendant joined, put the trial court on notice of defendant's objection to the community caretaking instruction. The trial court's inquiry as to whether defendant wished to take "any further exceptions to the instructions," "aside from what was done before closing argument," demonstrates that the trial court was fully aware of defendant's earlier exception. *See Wyatt*, 331 Or at 343 ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with

enough clarity to permit it to consider and correct the error immediately, if correction is warranted."). Thus, defendant's assignment of error was preserved.

Whether a jury is correctly instructed is a question of law that we review for errors of law. *State v. Barnes*, 329 Or 327, 333, 986 P2d 1160 (1999). As we explained in *Bistrika*, the trial court commits reversible error when it incorrectly instructs a jury on a material element of a claim or defense and that erroneous instruction, in light of the other instructions given, permits the jury to reach a legally erroneous result. 261 Or App at 727-28 (citing *Wallach v. Allstate Ins. Co.*, 344 Or 314, 329, 180 P3d 19 (2008)). Instructional error exists, where, *inter alia*, the instructions insert an irrelevant issue into the jury's deliberations concerning a material issue. *State v. Oliphant*, 347 Or 175, 194, 218 P3d 1281 (2009). In assessing instructional error, we look not only to the other instructions given, but also to the contentions of the parties at trial. *Vandeveere-Pratt v. Portland Habilitation Center*, 242 Or App 554, 565, 259 P3d 9 (2011). We will not reverse because of instructional error unless we "can fairly say that the instruction probably created an erroneous impression of the law in the minds of the jur[ors] which affected the outcome of the case." *State v. Pine*, 336 Or 194, 210, 82 P3d 130 (2003) (brackets in *Pine*; internal quotation marks omitted).

We conclude that the trial court erred when it instructed the jury on community caretaking because that instruction inserted an irrelevant issue into the jury's deliberations that permitted the jury to reach a legally erroneous result.[5] The state invoked the community caretaking statute during closing argument to persuade the jury that the officers were lawfully on the Bistrika property and that they had a continuing duty to investigate. Immediately following the state's rebuttal, the court instructed the jury that, to

---

[5] We note that our analysis is consistent with, but slightly different from, our analysis of the parallel argument in *Bistrika*, 261 Or App at 720-30, because, as noted earlier, Alexander was charged with violating ORS 162.247(1)(b) (unlawfully and knowingly refusing to obey a lawful order), while defendant was charged with violating ORS 162.247(1)(a) (unlawfully and intentionally attempting to prevent officers from performing lawful duties with regard to another person).

find defendant guilty of interfering with a peace officer, it had to find that, among other things, defendant attempted to prevent a peace officer from performing the officer's "lawful duties" with respect to another person. However, no instruction explained how the jury was expected to determine whether or not the relevant duties were lawful. The state was able to use that instructional vacuum to suggest that all of the officers' actions that night were conducted under the auspices of community caretaking and were therefore lawful.[6] The jury was not instructed that, contrary to the prosecutor's suggestion, the community caretaking statute does not authorize an officer to enter or remain on private property without a warrant or an exception to the warrant requirement. Although there is an "emergency aid" exception to the warrant requirement, there is not a "community caretaking" exception. *State v. Martin*, 222 Or App 138, 146, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009) ("ORS 133.033 does not independently establish an exception to the warrant requirement. Rather, it provides legislative authorization for (among other things) a particular class of searches, subject to many of the same constitutional constraints that operate to limit other searches, including the warrant requirement. A lawful community caretaking search, in other words, must first be within the universe of police action described in [the community caretaking statute,] ORS 133.033, and then it must also fall within one of the constitutional exceptions to the warrant requirement." (Internal quotation marks and citation omitted.)).

As defendant argues on appeal, the community caretaking instruction was harmful because it "went to the heart" of her defense on the interfering charges: that the officers had no lawful duties with which she could have interfered. We therefore conclude that the trial court erred in giving the community caretaking instruction, which "probably created an erroneous impression of the law in the minds of the jur[ors] which affected the outcome of the case." *Pine*, 336 Or at 210 (brackets in *Pine*; internal quotation marks omitted).

_____

[6] As discussed earlier, 262 Or App at 393, the emergency aid exception to the warrant requirement, not the community caretaking statute, authorized the officers' initial entry onto the Bistrika property.

The court's instructional error affects only defendant's convictions for interfering with a peace officer, ORS 162.247 (Counts 1 and 3). The community caretaking instruction pertains to the lawfulness of the officers' entry and continuing presence on the Bistrika property, and, therefore, to the lawfulness of their duties. In contrast, neither resisting arrest nor disorderly conduct requires proof that an officer was performing a lawful duty. ORS 162.315(3) ("It is no defense to a prosecution [for resisting arrest] that the peace officer or parole and probation officer lacked legal authority to make the arrest or book the person, provided the officer was acting under color of official authority."); ORS 166.025(1)(a) (stating elements of the type of second-degree disorderly conduct for which defendant was convicted). Thus, the court's instructional error requires us to reverse and remand defendant's convictions for interfering with a peace officer.

In sum, we conclude that the trial court did not err in denying defendant's motion to suppress because, although the emergency dissipated once Lane saw that Alexander was unharmed, the officer safety exception to the exclusionary rule applies to the facts of this case; defendant failed to preserve her second and third assignments of error for review; the state presented sufficient evidence for a rational factfinder to find that defendant recklessly created a risk of public inconvenience, annoyance, or alarm; and the trial court erred in instructing the jury on community caretaking functions.

Convictions on Counts 1 and 3 reversed and remanded; otherwise affirmed.