Argued and submitted January 14, 2020, reversed and remanded
March 10, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RACHAEL PATRICIA GOLDBERG,
*Defendant-Appellant.*

Lane County Circuit Court
17CR69845; A167666

483 P3d 671

Defendant appeals from his sole judgment of conviction of one count of failure to perform the duties of a driver when property is damaged, ORS 811.700. During the investigation of a hit-and-run vehicle accident, an officer took a piece of broken car bumper from the accident scene and later entered defendant's private property, stood in the driveway where defendant's car was parked, and compared and photographed the piece to defendant's bumper. Defendant assigns error to the trial court's denial of his motion to suppress the photograph on the theory that the officer's actions constituted a warrantless search. Defendant also argues that visible scratch and scuff marks are insufficient to constitute "damage" for purposes of ORS 811.700. *Held*: The trial court erred in denying defendant's motion to suppress. The officer's actions in kneeling by the vehicle, holding up the broken piece, and photographing it, exceeded the social norms that one reasonably expects of visitors and exceeded the scope of consent that a reasonable property owner holds out to those visitors seeking to make contact. It does not matter that the officer did not physically touch the car. Regarding the issue of "damage," in the light most favorable to the state, the scuff and scratch marks on the vehicle were sufficient for the trial court to deny the motion for judgment of acquittal.

Reversed and remanded.

En Banc

Charles D. Carlson, Judge.

Francis Gieringer argued the cause for appellant. On the brief were Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Sara F. Werboff, Deputy Public Defender, Office of Public Defense Services.

Dashiell Farewell argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and E. Nani Apo, Assistant Attorney General.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Lagesen, Tookey, DeHoog, Shorr, James, Aoyagi, Powers, Mooney, and Kamins, Judges.

JAMES, J.

Reversed and remanded.

James, J., filed the opinion of the court in which Armstrong, Ortega, Lagesen, Tookey, DeHoog, Shorr, and Aoyagi, JJ., joined.

DeVore, J., concurred in part and dissented in part and filed an opinion in which Egan, C. J., Powers, Mooney, and Kamins, JJ., joined.

**JAMES, J.**

In furtherance of his investigation of a hit and run vehicle accident, an officer took a piece of broken car bumper from the scene. He entered defendant's private property, stood in the driveway where defendant's car was parked, crouched down to hold the broken piece up to the vehicle like a jigsaw puzzle piece, and took the following photograph:



The state charged defendant with one count of failure to perform the duties of a driver when property is damaged, ORS 811.700. At trial, defendant argued that the officer's actions constituted a warrantless search and moved to suppress. The state argued that the officer's location in the driveway was consistent with a social visitor, and that by virtue of the fact that the officer did not touch the car, his actions were lawful.

In considering the motion to suppress, the trial court noted, "I don't recall any testimony that there was any touching. We're talking about observations and utilizing some other part to compare." Ultimately, although recognizing this exact fact scenario was not addressed in case law, and that "[w]e're kind of on a cusp here," the trial

court denied the motion to suppress, relying on a distinction between manipulation and observation:

> "It appears to me the officer, under Oregon case law, had a right to be in the front yard in that area, and these were mere—mere observations.
>
> "The fact that he had something in his possession from a victim doesn't mean it's a search of that item. It's not a manipulation of the vehicle, holding it up to compare, I think, is part of the observation."

Defendant was convicted of the sole charge, and now appeals, raising two assignments of error.

We selected this case for en banc consideration to answer this question: Is the fact that an officer didn't touch or manipulate an object determinative as to whether his actions, while being present on private property without a warrant, constituted a search? The answer is no.

As we explain, when an officer is present on private property without a warrant, the touchstone of the inquiry into whether the officer conducted a search is focused on the reasonable scope of permission a landowner holds out to the public for social entry, and the norms of behavior reasonably expected of social visitors. When an officer exceeds the reasonable invitation to the public, either by being at a location not reasonably related to social access, or by behaving in a way contrary to the reasonably accepted norms of behavior for a visitor to the property, a search has occurred. Here, the officer's actions exceeded those reasonably accorded social visitors, and the trial court erred in denying defendant's motion to suppress. As that error was not harmless, we reverse and remand.

"We review the trial court's denial of the motion to suppress for legal error." *State v. Miller*, 267 Or App 382, 383, 340 P3d 740 (2014). In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by constitutionally sufficient evidence in the record. *State v. Martinez*, 305 Or App 220, 221, 468 P3d 1021 (2020), *rev den*, 367 Or 496 (2021). The facts pertinent to the issue on appeal are brief and undisputed.

Daniel Gonzales, the complainant of the hit-and-run, was driving his truck to work on October 16, 2017, when he felt a vehicle hit the rear of his truck. He saw a white car speed off. He pulled over and inspected his truck, seeing paint transfer marks on the rear passenger quarter panel and tire. He also observed pieces in the road that appeared to have come from the other vehicle, and he collected them and placed them in the truck bed.

Deputy Bryan Holiman went to look at the truck and vehicle parts and photographed them. Based on an internet search of the grill design and other pieces, the deputy believed that the car that struck Gonzales was a white Chevrolet Impala made between 2006 and 2010.

Two days later, Holiman received new information which led him to a friend of defendant's, McLaughlin. McLaughlin knew that defendant drove a white Impala and he had given defendant a ride the day before. McLaughlin told Holiman that the Impala had been in a "fender-bender."

Holiman knew defendant from other contacts and knew that she drove a white Impala with Nevada license plates. Holiman went to the address where he believed defendant was staying and saw a white Impala with Nevada plates parked in the driveway. He approached the Impala and saw that it had front-end damage consistent with the accident report. Holiman left to retrieve the vehicle pieces from Gonzales and returned to defendant's address. He entered the driveway and compared the pieces to the Impala, holding them up against the bumper to reveal that the pieces fit perfectly. He took a photo of him holding the broken piece against the bumper, which was admitted into evidence at the trial. It is the deputy's act of piecing the bumper together and taking that photo that was the focus of the suppression motion, and the subject of this appeal.

Article I, section 9, of the Oregon Constitution guarantees that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" "[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." *State v. Campbell*, 306 Or 157, 163, 164, 759 P2d 1040 (1988) (emphases

in original). The rights afforded under Article I, section 9, are at their apex in the home—the "quintessential domain protected by the constitutional guarantee against warrantless searches." *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983).

In considering whether a violation of Article I, section 9, has occurred, we ask whether the government's conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy." *State v. Dixson/ Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). "[T]he threshold question in any Article I, section 9, search analysis is whether the police conduct at issue is sufficiently intrusive to be classified as a search." *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990) (citing *Campbell*, 306 Or at 162-63). "One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995).

The protection of Article I, section 9, extends beyond the home to include the curtilage. *State v. Breshears/Oliver*, 98 Or App 105, 111, 779 P2d 158 (1989). When considering a warrantless entry onto the curtilage of private property, an officer's status as law enforcement affords him no greater right to intrude than any other stranger. *See State v. Ohling*, 70 Or App 249, 252, 688 P2d 1384, *rev den*, 298 Or 334 (1984); *see also State v. Russo*, 68 Or App 760, 763, 683 P2d 163 (1984). If an officer's presence on the property is trespassory, it is an unconstitutional search. *See State v. Lee*, 120 Or 643, 649, 253 P 533 (1927); *Smith v. McDuffee*, 72 Or 276, 284, 142 P 558, 143 P 929 (1914); *State v. Russo*, 68 Or App 760, 683 P2d 163 (1984); *State v. Brown*, 1 Or App 322, 461 P2d 836 (1969), *rev den* (1970).

However, when considering the curtilage surrounding a home there exists an operative, but rebuttable, presumption—that the landowner has impliedly consented to visitors going to the front door of the house. *See State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den*, 298 Or 334 (1984). As we said in *Ohling*,

"[g]oing to the front door and knocking was not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and

political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion."

*Id*.

The rebuttable presumption of implied consent to approach the front door of the home is bounded by two considerations: location and behavior. An officer exceeds the implied consent as to location when the officer deviates from the path to the front door and explores other areas of the curtilage where, according to social norms, visitors would not have an implied invitation:

"Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so. '[W]e do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck.' *State v. Corbett*, 15 Or App 470, 475, 516 P2d 487 (1973), *rev den* (1974)."

*Id*. at 253. (brackets in original). Those same social norms constrain the behavior of an officer, even when he is present in a permissible area of the curtilage. "An officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant." *State v. Gabbard*, 129 Or App 122, 128, 877 P2d 1217 (1994).

In *State v. Portrey*, police found a boot print at the site of a burglary. Suspecting defendant's involvement, officers went to his home to question him. 134 Or App 460, 462, 896 P2d 7 (1995). On the defendant's front porch, the officers observed a pair of boots sitting in a box. One of the officers picked up the boots, turned them over, and looked at the soles. The soles matched the boot print at the burglary and police thereafter obtained a search warrant for the defendant's home. *Id*. at 463.

We held that the officer's act of picking up and looking at the soles of the boots was an unconstitutional search. Our conclusion was grounded in the principle that

the implied consent that allows for an officer to enter the curtilage to approach a front door does not extend to conduct beyond that which would reasonably be expected of someone approaching the door:

> "[T]he intrusion to which an occupant impliedly consents is limited. One may expect that visitors will stand on the front porch for the purpose of engaging in conversation, but that does not mean that it is expected that visitors will pick up items on the front porch and examine what is not in view. By impliedly consenting to one form of intrusion, an occupant does not necessarily consent to being subjected to other forms of scrutiny as well."

*Id*. at 465.

In *State v. Cardell*, the Toledo Police Department received an anonymous report that a car was "racing" in the area. 180 Or App 104, 106, 41 P3d 1111 (2002). An officer received a dispatch that the suspect car was a blue Pontiac GTO. The officer saw the suspect vehicle in a driveway. As the officer walked up the driveway to contact the home-owner, "he stopped and felt the rear tires to determine if they were hot. In Gillespie's opinion, the tires were hotter than they would be due to normal driving and the slippage of the tires on the road likely had caused the tires to become that hot." *Id*. at 106. We held that the officer's actions constituted an unconstitutional search in violation of Article I, section 9:

> "In walking past the car, Gillespie did nothing unlawful. Visitors, including the police, have implied consent to enter the driveways and front yards of homes, in the absence of some overt action by the residents to exclude them.
>
> "* * * * *
>
> "Whether officer Gillespie could touch the tires, however, is a distinct and different issue. The scope of a home-owner's implied consent to approach the home is limited to those acts reasonably undertaken to contact the residents of the home; such consent does not extend, for instance, to an exploratory search of the curtilage."

*Id*. at 108 (citing *Ohling*, 70 Or App at 253, and *State v. Somflethi*, 168 Or App 414, 425, 8 P3d 221 (2000)).

Applying those principles here, to determine whether the officer's actions in this case constituted an unlawful search, we consider whether the officer, either by location or action, exceeded the reasonable scope of consent to entry onto the property held out by the occupant. The parties do not dispute that the officer, standing in the driveway, did not exceed the scope of consent as to location. We agree. As we said in *Cardell*, "[v]isitors, including the police, have implied consent to enter the driveways and front yards of homes." *Id*. at 108. The question therefore distills down to whether the officer's actions here exceeded the scope of consent, as defined by the expected social norms of behaviors for persons "to take reasonable steps to make contact with the occupant." *Gabbard*, 129 Or App at 128. They did.

It does not matter that the officer did not physically touch the car, as was the trial court's focus here. Hovering one's finger a centimeter above an object does not categorically transform an action from unlawful to lawful. That the officer here may not have pieced the bumper together so the pieces were actually touching (although the photos tend to suggest that the pieces were touching) is not the appropriate focus. Neither *Portrey* nor *Cardell* sought to carve out physical touching or manipulation as a dispositive factor. The inquiry is broader—asking whether an officer's actions exceed those to which a reasonable property occupant impliedly consents. As we said in *Portrey*, "[o]ne may expect that visitors will stand on the front porch for the purpose of engaging in conversation, but that does not mean that it is expected that visitors will pick up items on the front porch and examine what is not in view." 134 Or App at 465.

In *State v. Fortmeyer/Palmer*, we held that,

> "[t]o find strangers, on their knees, attempting to peer through what appears to be a covered basement window, would be suspicious, uncommon, and unacceptable in our society."

178 Or App 485, 492, 37 P3d 223 (2001) (citing *Portrey*, 134 Or App at 464-65 (whether police engage in a search by examining items not "entirely visible" depends, in part, on "social and legal norms of behavior") and *State v. Larson*, 159 Or App 34, 41, 977 P2d 1175, *rev den*, 329 Or 318 (1999)

("The presence of an individual, other than a resident or guest, in the back area of an apartment building, peering up at the second-floor windows, would offend social and legal norms of behavior.")).

Similarly, the average home occupant would be reasonably concerned to find a stranger squatting down by the front of their car, parked in their driveway, holding up an object and photographing the vehicle. Rather than being the normal social behavior one reasonably expects from a visitor, this is the type of behavior that is more likely to draw, at a minimum, a shout of alarm and inquiry—"Hey! What are you doing?"—if not a call to the police. The officer here stood in no superior position to a stranger. Acts that would be seen as intrusive and unacceptable by a nosy neighbor are no less so when performed by law enforcement.

The officer's actions here exceeded the social norms that one reasonably expects of visitors and exceeded the scope of consent that a reasonable property owner holds out to those visitors seeking to make contact. Those actions converted the officer's presence into a trespass, which in turn rendered them a search in violation of Article I, section 9. Accordingly, the trial court erred in denying defendant's motion to suppress. The product of that search—the photographs taken—were relied upon by the state at trial. The admission of those photographs was harmful to defendant, and the state does not contend otherwise.[1]

Finally, we address one remaining issue: whether the trial court erred in denying defendant's motion for judgment of acquittal on the count of failing to perform the duties of a driver when property is damaged, ORS 811.700. Defendant argues that visible scratch and scuff marks are insufficient to constitute "damage" for purposes of the statute. We disagree.

---

[1] In the trial court, the parties litigated whether defendant's subsequent statements to the officer—given the following day—derived from the violation of defendant's constitutional rights or whether the officer's questions were based entirely on what he knew before that point. Because it concluded that there was no violation, the trial court did not reach the scope of suppression or resolve the parties' legal and factual disputes on that issue. On remand, the trial court can consider the scope of suppression in light of our ruling.

First, we note that ORS 811.700 mandates that one of the duties of a driver is to "[i]mmediately stop the driver's vehicle at the scene of the collision * * *" for, among other purposes, to facilitate the exchange of information as to the "insurance carrier covering the motor vehicle, the insurance policy number of the insurance policy insuring the motor vehicle and the phone number of the insurance carrier." ORS 811.700(1)(a), (b). The exchange of insurance information, for even the most minor of scratches, facilitates the filing of claims and the general motor vehicle insurance scheme.

Second, in *State v. Jones*, 298 Or App 264, 268, 445 P3d 358 (2019), in the context of ORS 164.354, we held that the plain and ordinary meaning of the term "damage" included physical harm or "losing completeness, efficiency, or function." We held that property "may be damaged even if such loss of efficiency or function has no appreciable affect on the economic value. Even objects with no economic value at all can be damaged if the harm affects some other value— like sentimental value." *Id*. Defendant has not persuaded us that ORS 811.700 requires a different common meaning of damage than ORS 154.354. *See also State v. Morales*, 309 Or App 777, 482 P3d 819 (2021) (applying *Jones* in a related context).

Here, on this record, in the light most favorable to the state, the scuff and scratch marks on the vehicle were sufficient for the trial court to deny the motion for judgment of acquittal.

Reversed and remanded.

**DeVORE, J.,** concurring in part, dissenting in part.

The majority holds that a deputy conducts an unlawful search in violation of Article I, section 9, of the Oregon Constitution—after looking at a damaged car in the home's parking area where he has lawful permission to be and after having spoken with the home's residents— when the deputy stoops to compare and photograph a trim-fragment from the accident scene to the damaged car of the hit-and-run driver. Although defendant, the car's owner, had not covered or hidden her car and although the home's

residents expressed no offense at the deputy's interest in the car when the deputy visited them repeatedly, the majority opinion, preferring to rely upon an abstraction, determines that our "social and legal norms of behavior" are offended and, accordingly, so too our constitution.

I respectfully disagree because the majority opinion retreats to an abstraction, determined later on appeal, and departs from our line of more developed case law that, until now, has provided officers and courts a bright line to observe: That is, an officer exceeds a homeowner's implied consent to be present in the curtilage approaching a home when the officer manipulates objects in a manner that reveals information otherwise visually impossible to see. *See State v. Portrey*, 134 Or App 460, 466, 896 P2d 7 (1995) (overturning boot); *State v. Cardell*, 180 Or App 104, 109, 41 P3d 1111 (2002) (feeling heat of tires).

I do agree with the majority opinion on the first assignment of error that the trial court properly rejected defendant's motion for judgment of acquittal, challenging whether the victim's truck sufficed as "damaged" for purposes of the hit-and-run statute, ORS 811.700 (2017).[1] That question is addressed, among other reasons, because it is likely to arise again upon remand insofar as the evidence to be excluded by the majority opinion is only that from the deputy's second visit at which the comparison photographs were taken, not the earlier photographs of the damaged car from the deputy's first visit to the property.[2]

---

[1] In relevant part, ORS 811.700(1) (2017) provides:

"A person commits the offense of failure to perform the duties of a driver when property is damaged if the person is the driver of any vehicle and the person does not perform duties required[.]"

This statute, ORS 811.700 (2017), *amended by* Or Laws 2017, ch 75, § 1; Or Laws 2018, ch 22, § 1, is the version that was in effect at the time of the incident in this case. As such, the subsequent amendments do not affect the analysis, and all references in this opinion are to the 2017 version.

[2] Like the majority opinion, I express no opinion on the later visits to the property at which the deputy visited defendant camped in the backyard. Whether the deputy's visits later with defendant resulted independently from the deputy's first permissible visit with the residents, resulted only from the comparison of the accident fragment to the car, or were in themselves otherwise impermissible remains for the trial court to determine upon remand. *See State v. Unger*, 356 Or 59, 333 P3d 1009 (2014) (discussing exploitation analysis for admissibility of evidence discovered after an unlawful search).

In her second assignment of error, defendant argues that the trial court erred in denying her motion to suppress. For purposes of reviewing a motion to suppress, we consider the relevant facts as adduced at the suppression hearing. *State v. Bistrika*, 262 Or App 385, 388, 324 P3d 584, *rev den*, 356 Or 397 (2014), *cert den*, 577 US 1022 (2015). We defer to the trial court's factual findings as long as there is evidence in the record to support them, and we presume, with regard to pertinent and disputed facts for which there are no express findings, that the trial court decided those facts in a manner consistent with its ultimate conclusions. *State v. Mazzola (A139257)*, 238 Or App 201, 203, 242 P3d 674 (2010). Because the facts matter, this opinion gives them more attention.

Defendant's car struck Gonzales's pickup truck, and defendant left the scene without stopping to exchange the information required by ORS 811.700.[3] Gonzales saw a white car drive away. He collected pieces of the car's bumper cover and grill from the middle of the street. Later that day, Deputy Holiman spoke with Gonzales. Holiman photographed the paint transfer, scratches, and abrasion on the rear quarter panel of the pickup and on the steel wheel.

From the remnants of white car that Gonzales had collected, Holiman deduced that car was a white Chevy Impala, likely made between 2006 and 2010. Two days later, an acquaintance of defendant told Holiman that defendant was the owner of a Chevy and that she had been driving at the time of the accident. Holiman happened to know from previous interactions with defendant that defendant drove a white Chevy Impala.

On his first of four visits, Holiman drove to a rural residential property where defendant was camping in the backyard, and he parked along the lane. An unpaved parking area, suitable for several cars, was adjacent to a shed structure with "a ramp leading up to a kind of a covered walkway to the front door of the house." Holiman saw a white Chevy Impala with Nevada license plates in the parking

---

[3] Under these circumstances, ORS 811.700(1)(a) required that defendant should have stopped and given Gonzales her name, address, and her vehicle registration number.

area by the shed and ramp to the door of the house. Upon seeing the Chevy, Holiman confirmed that the car belonged to defendant through Nevada DMV records. While walking from the road through the parking area toward the front door, Holiman immediately saw that the Chevy had extensive front-end damage and that most of the front bumper trim was missing.

Holiman testified that the first thing he did was to go "and knock[] on the door and talk[] with someone at the house." Paynter, the owner, did not express any displeasure with the deputy's presence and did not tell the deputy to leave. Paynter told Holiman that defendant was living in a tent around the back of the property but that she was not present at the time. Failing to find defendant, Holiman left—but, at some point before leaving, he took photos of defendant's car in the parking area by the shed and ramp to the front door.[4]

Holiman called Gonzales's wife and borrowed the car remnants that Gonzales had collected at the scene of the accident.

Later the same day, Holiman returned with the remnants to the Paynter property where defendant was camping. This repeat visit is when the comparison photographs were taken that become the issue in this case. Holiman spoke with Paynter's 30-year-old son who lived there and who said that defendant was not at the property. In his testimony, Paynter's son described the location, saying that there was no signage on the property telling people that they cannot come on the property. He said that he did not tell Holiman that he could or could not come on the property, and he did not tell Holiman to leave. He testified, "[Holiman] just stood right there in front of me next to the vehicle." The conversation with the deputy took place "directly next to the vehicle" and the woodshed. The woodshed is in front of the house between the house and street. He recalled that the "nature of the contact" was that the deputy was looking for defendant. In the apparent presence of Paynter's son, Holiman took photographs of the Chevy as it sat in the parking area,

---

[4] Those photographs of the damaged, white car are not at issue.

uncovered and in the open, where they talked. Holiman held a remnant of the bumper trim up to the car to where the broken edges aligned. Holiman saw that the color and shape of the molding remnant found at the accident scene matched the vehicle.

The following morning, Holiman returned to the property and spoke to defendant from outside her tent. Defendant was inside and refused initially to speak with him. She relented and invited Holiman in. She made a few statements confirming her ownership and sole control of the vehicle. She promised to come to Holiman's office that day before noon to discuss the accident. Defendant, however, failed to appear at his office, so Holiman returned to the property to speak with her and, ultimately, arrested her.

Before trial, defendant moved to suppress the evidence obtained during Holiman's trips to the property, including the photographs taken by Holiman. Defendant argued that Holiman conducted a warrantless search of the Chevy in violation of Article I, section 9, of the Oregon Constitution when he paused and held the bumper pieces up to the Chevy.[5] The trial court denied the motion to suppress, concluding that Holiman did not perform a search when he compared pieces of the bumper trim to the Chevy as the car sat in the open parking area.

The majority opinion finds that ruling to be error. Thus, the question becomes whether Holiman performed an unlawful search when, in the parking area where he had legally implied or factually tacit permission to be, he compared broken pieces of bumper trim to the hit-and-run car. Like the facts, the answer requires a closer look at the law.

The Oregon Supreme Court has "emphasize[d]" the scope of the protection guaranteed by Article I, section 9, by reminding us that the provision does not protect citizens from all forms of governmental observation, but only from

---

[5] At the suppression hearing, the trial court corrected defense counsel's argument that described the deputy as "touching the vehicle." The court recounted, "I don't recall any testimony that there was any touching. We're talking about observations and utilizing some other part to compare." Defense counsel did not disagree, responding instead, "I believe that Officer Holiman actually *held* the piece *up to* the car and photographed an exact match ***." (Emphases added.)

unreasonable searches and seizures. *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990). As a result, "the threshold question in any Article I, section 9, search analysis is whether the police conduct at issue is *sufficiently intrusive* to be classified as a search." *Id.* (emphasis added). "One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *Portrey*, 134 Or App at 464. However, people may sacrifice their right to privacy by conducting themselves "in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside *without any special effort.*" *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983) (emphasis added). Beyond such abstract statements, the case law of this court has developed to define what is "sufficiently intrusive" in two lines of cases when an officer peers *into* a home and when an officer is merely present outside of a home in publicly permissible areas of approach. Both lines of cases are instructive here.

Generally, "a person's home is the 'quintessential domain protected by the constitutional guarantee against warrantless searches.'" *State v. Fortmeyer/Palmer*, 178 Or App 485, 488, 37 P3d 223 (2001) (quoting *State v. Louis*, 296 Or at 60). We recognize that a person's privacy interest in the home extends to the area outside the home, known as the curtilage. *City of Eugene v. Silva*, 198 Or App 101, 107, 108 P3d 23 (2005). However, that privacy interest in curtilage is qualified. "[A]bsent evidence of an intent to exclude, an occupant impliedly consents to people walking to the front door and knocking on it, because of social and legal norms of behavior." *Portrey*, 134 Or App at 464. Police officers, like any other person, are at liberty to observe all objects and activities from that vantage point, and any observations made along the way do not constitute a search. *Id.* at 465. Some time ago, we elaborated on those "social and legal norms of behavior," stating:

> "Going to the front door and knocking was not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a

moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion. Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so."

*State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den*, 298 Or 334 (1984) (citation omitted) (determining that, unlike plants that might be on a front porch, marijuana plants on a back porch were not in an area subject to implied permission to enter). We have explained our analysis in terms of trespass, observing:

"By their actions the officers intruded onto the curtilage of defendant's dwelling. Their action was a trespass unless it was privileged or had defendant's express or implied consent. If it was trespassory, the search violated Art I, section 9 of the Oregon Constitution."

*Id*. at 252; *see id*. at 254 ("What they did instead was trespass within the curtilage of defendant's dwelling, a constitutionally protected area.").

A line of cases indicates that peering *into* a home is problematic, most particularly where the occupant has taken steps indicative of a desire for privacy and the officer's actions or behavior are intrusive. For example, in *Fortmeyer*, the defendant refused to give consent to officers to allow them into the home to search for growing marijuana. 178 Or App at 487. Rebuffed, the officers went to a common area adjoining defendant's house with the neighbor's permission. From there, they saw a basement window imperfectly blocked by a leaning door panel and cardboard. By kneeling down and peering just right through a narrow gap in the window's obstructions, the officers saw marijuana growing inside. *Id*. at 487-88. Defendant moved to suppress, arguing that he had communicated a desire for privacy with those obstructions. We agreed. Although the officers were in a lawful viewing place, we determined that their behavior in kneeling down and turning their heads at a particular angle to peer through a covered window breached the social and legal norms of behavior. It was an unlawful search. *Id*. at 491-92; *see also State v. Gabbard*, 129 Or App 122,

877 P2d 1217, *rev den*, 320 Or 131 (1994) (bending down and peeking through a crack in siding constituted a search).

We reached the opposite conclusion in *State v. Castillo-Salgado*, 186 Or App 605, 611, 64 P3d 1169, *rev den*, 336 Or 60 (2003). We began with the observation that a "'police officer's unaided observation, purposive or not, from a lawful vantage point is not a search * * *.'" *Id.* at 610 (quoting *Ainsworth*, 310 Or at 621). The defendant argued that an officer violated social norms when, while passing by an apartment window on a walkway the officer inclined his head in order to see through a gap in blinds that had been left as if someone had peered outside. We disagreed. We held, under the totality of the circumstances, that the officer was in a lawful vantage point, that the officer's attention had been drawn by movement inside, that he saw defendant's activities without engaging in any extraordinary effort, and that he did not invade defendant's privacy interest. That conduct was not a search. *Id.* at 611; *see also State v. Rodriguez-Ganegar*, 186 Or App 530, 538, 63 P3d 1225, *rev den*, 335 Or 578 (2003) (no search occurred where a loud noise drew an officer's attention to a three-fourths to one inch vertical gap in motel curtains and it took no "special effort" to see the activity plainly visible inside).

A second line of cases pertains to when an officer is outside in the curtilage, approaching a house and encounters something plainly visible without special effort. In that context, the question posed in *Ainsworth* "whether the police conduct at issue is *sufficiently intrusive* to be classified as a search," 310 Or at 616 (emphasis added), becomes a question whether the officer handled or examined the object in a way to reveal something that was not visible. For example, in *Portrey*, we determined that an officer exceeded the homeowner's implied consent and performed a search where he picked up a boot that was next to the front door and turned it over to reveal that the sole of the boot matched impressions left at a crime scene. 134 Or App at 465-66. We explained:

> "[D]efendant's privacy interest continued in the articles on his front porch that were not entirely visible to someone standing there, even though he had impliedly consented to visitors coming to his front door. The officers' actions intruded on a privacy interest defendant maintained in

> the area around his front door to which defendant had not
> impliedly or expressly consented."

*Id*. at 465. Because turning the boot over revealed what
otherwise was not visible, the conduct constituted a search.

Similarly, in *Cardell*, we concluded that an officer
performed a search where he felt the tire of a car parked
along the pathway to a front door because doing so revealed
that the tire was hot, indicative of recent use consistent
with a report of "racing." 180 Or App at 109-10. Feeling the
tire's heat revealed something not visible and, accordingly,
exceeded the scope of implied consent. *Id*. at 109.

On the facts of this case, the officer's conduct was
not "sufficiently intrusive" or contrary to "social and legal
norms" as demonstrated by the existing lines of cases. The
conduct at issue here does not involve kneeling to peer
through a gap in siding or an obstructed window to see
inside a home. *See, e.g.*, *Fortmeyer*, 178 Or App at 490-91
(peering into obstructed basement window). Nor does the
conduct involve manipulating an object in the curtilage out-
side a home to reveal information that is not already visible.
*Portrey*, 134 Or App at 465-66. Nor, for that matter, does the
conduct involve the use of *extraordinary* efforts to uncover
hidden information such as the use of thermal technology or
drug-sniffing dogs. *See Kyllo v. United States*, 533 US 27, 121
S Ct 2038, 150 L Ed 2d 94 (2001) (use of sense-enhancing
technology to gather information regarding interior of home
that could not otherwise have been obtained without phys-
ical intrusion into constitutionally protected area consti-
tutes a "search" under the Fourth Amendment to the United
States Constitution); *Florida v. Jardines*, 569 US 1, 133 S Ct
1409, 185 L Ed 2d 495 (2013) (drug-sniffing dog on front
porch constituted a search under the Fourth Amendment).

The facts of this case do not constitute conduct that
is "sufficiently intrusive" in any of those ways, nor in some
new way. The facts that drive that conclusion are undis-
puted. Before visiting the property, Holiman had researched
and identified the make and model of the hit-and-run car
from the remnants Gonzales had recovered. Holiman knew
what to look for. On his first visit, as he walked up the drive-
way toward the front door of the residence, Holiman was

in a lawful vantage point when he observed the front-end damage to the Chevy.[6] His eyes were drawn to the portion of the Chevy's grill and bumper trim that was missing. He made that observation without any extraordinary effort to see what could not be readily seen or to peer into secluded spaces. No one disputes his entrance, observations made, or the photographs taken of the damaged car from the first visit.

Likewise, on his second visit, it took no extraordinary action or unusual movement for the deputy to take a closer look at defendant's Chevy as it sat openly in plain view.[7] The car still sat beside the shed and entrance ramp to the front door. Holiman and Paynter's son talked standing beside the car.

We are taught by *Ohling* that the "social and legal norms" are indicated, informed, or controlled by the facts at hand in a particular case. *Portrey*, 134 Or App at 464 (discussing *Ohling*, 70 Or App at 253). Generally, without trespassing, anyone from Girl Scouts to political candidates may approach through entrance curtilage, and that is no less true for a deputy. *Ohling*, 70 Or App at 253. Generally, implied consent governs. *Id.* But, specific facts inform or even control. "Other evidence" may be found to show "a desire to exclude causal visitors" such as "posted warnings, a fence, [or] a moat filled with crocodiles." *Id.* By the same token, a willing engagement with the residents should be equally relevant as crocodiles to our understanding of whether trespass has occurred or "social and legal norms" have been violated in the facts at hand.

Here, there were no signs or crocodiles to keep out casual visitors. To the contrary, the occupants whom the deputy found engaged with the deputy without any reservation or objection. First, Holiman spoke with the homeowner Paynter and next with his adult son. Paynter was not

---

[6] Defendant acknowledges on appeal, "Here the officer's initial observation of the front-end damage to the Impala was lawfully obtained when he saw it as he was walking to the front door of the residence."

[7] *See Castillo-Salgado*, 186 Or App at 611 (concluding that no search occurred where an officer observed illegal activity through a gap in kitchen window blinds as he approached a front door after his attention happened to be drawn by movement inside the apartment).

displeased with the deputy's presence and did not tell the deputy to leave. At some point, Holiman took the first set of photos of the car, which are not at issue. On his second visit, Holiman spoke with Paynter's adult son while the two men stood beside the car at the shed and entrance ramp to the house. The son did not say whether Holiman could be on the property, nor did he tell Holiman to leave. Construing the facts in the light most favorable to the trial court's ruling, *see Bistrika*, 262 Or App at 400, neither man felt a need to discuss permission. In short, Holiman had the tacit permission, not just implied permission, to be present beside the car with Paynter's son.

To confirm the conclusion that he had already reached—that the recovered remnants came from defendant's Chevy, Holiman held a trim remnant next up to the damaged car and took photographs. By comparing the trim remnant with the car, Holiman did not discover any new information that was not already openly visible on the first visit. The mere matching of the remnant with the car revealed nothing that could not have been done later with separate photographs. Two separate photographs—one of the remnant and one of its place on the damaged car—would permit a viewer to match the remnant and the car. Although holding a trim remnant up to the car to take a photograph may have provided the police with a vivid, recorded depiction of Holiman's observation of the car, holding the piece up to the car was not necessary for Holiman to come to the conclusion that the remnant originated from the defendant's car. Holiman held the broken pieces up to the Chevy only to demonstrate the conclusion that he had already reached through simple observation. The pieces of trim in his hands came from defendant's Chevy.

Because there is no reason to believe that Paynter's son had left the scene, Holiman's comparison apparently occurred in his presence. There is no reason to assume that the comparison offended the "social or legal norms" as to Paynter's son. Because defendant had left her car unhidden and uncovered in a place where anyone could approach the house, there is no reason that Holiman's comparison offended the "social or legal norms" as to defendant who camped in the backyard of the property. Because the comparison did

not require Holiman to kneel to peek into a secluded space, it does not matter that Holiman may have crouched to hold the remnant and take the photographs; there is no reason to declare that to be extraordinary behavior on these facts. *Compare Fortmeyer*, 178 Or App at 487 (kneeling to peer in obscured basement window).

Unlike the soles of the boot in *Portrey* or the heat of the tire in *Cardell*, the broken edges of the Chevy's grill and bumper trim were visually exposed to Holiman without the need for any tactile interaction with the object. Holiman did not manipulate the car to reveal something hidden from view. He did not move car parts or test the car for unseeable information. While in a lawful vantage point and after talking with a property occupant, Holiman only observed and photographed what was plainly visible with the collision remnant in his hand. In so doing, he did not engage in "intrusive" behavior, contrary to the implied or tacit permission of the occupants, nor contrary to Article I, section 9, of the Oregon Constitution.

In my view, the prior lines of cases provide specific rules that are easier to apply in the field and enforce in the courtroom. The test of *Portrey* and *Cardell* is a bright line against manipulation of an object in the curtilage to reveal unseen information. The test of the majority opinion, however, whether we would be offended if we were the home occupant, is a subjective judgment that we make later, divorced from the conduct of the occupants in the case at hand. I fear that test may prove unhelpful.

On the first assignment I concur; on the second assignment, I respectfully dissent.

Egan, C. J., Powers, Mooney, and Kamins, JJ., join in this dissent.