Argued and submitted November 21, 2022, reversed and remanded
March 22, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL LEE SOPRYCH,
*Defendant-Appellant.*

Washington County Circuit Court
19CR54508, 17CR76882;
A176391 (Control), A176392

527 P3d 808

In this consolidated appeal, defendant appeals (1) a judgment of conviction for one count of unlawful possession of 3, 4-methylenedioxymethamphetamine (MDMA) in a usable quantity, ORS 475.874(2)(a); and (2) a judgment extending his probation in an unrelated criminal case based on that possession conviction. He assigns error to the trial court's denial of his motion to suppress evidence on which his conviction was based. That evidence was found during a warrantless search of a locked safe in defendant's bedroom; the state's theory was that defendant consented to the search. The trial court denied the motion to suppress, agreeing with the state that defendant had consented to the search of the locked safe. *Held*: The record did not allow for the nonspeculative inference that defendant intended to consent to the search of the locked safe, as required under *State v. Blair*, 361 Or 527, 396 P3d 908 (2017).

Reversed and remanded.

Ricardo J. Menchaca, Judge.

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellant Section, Office of Public Defense Services.

Colm Moore, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Lagesen, Chief Judge, and Jacquot, Judge.*

_____

* Jacquot, J., *vice* James, J. pro tempore.

LAGESEN, C. J.

Reversed and remanded.

## LAGESEN, C. J.

In this consolidated appeal, defendant appeals (1) a judgment of conviction for one count of unlawful possession of 3, 4-methylenedioxymethamphetamine (MDMA), in a usable quantity, ORS 475.874(2)(a); and (2) a judgment extending his probation in another criminal case based on the guilty verdict in the first case. He assigns error to the trial court's denial of his motion to suppress evidence of the controlled substances on which his conviction was based. Those controlled substances were found during a warrantless search of a locked safe in defendant's bedroom; the state's theory was that defendant consented to the search. The trial court denied the motion to suppress, agreeing with the state that defendant had consented to the search of the locked safe in which the controlled substances were found. We conclude that the record does not allow for the nonspeculative inference that defendant intended to consent to the search of the locked safe, as required under *State v. Blair*, 361 Or 527, 396 P3d 908 (2017). Accordingly, we reverse and remand both judgments for further proceedings.

We review a trial court's denial of a motion to suppress by "accepting the trial court's supported factual findings and determining 'whether the trial court applied legal principles correctly to those facts.'" *State v. Soto-Navarro*, 309 Or App 218, 223, 482 P3d 150 (2021) (quoting *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993)). Absent express factual findings, we presume the trial court found the facts in a manner consistent with its ultimate conclusion. *State v. Peek*, 310 Or App 587, 589, 485 P3d 292, *rev den*, 368 Or 597 (2021).

The relevant historical facts are not disputed; we take most of them from the transcription of the audio from the body camera recording of defendant's arrest and the search of his house; the recording was played into the record at the hearing on the motion to suppress and thereby made part of the transcript.

Officers from the Beaverton Police Department went to defendant's home after defendant's roommate reported that defendant had pistol-whipped him at their residence. After police called loudly for defendant to come out of his

house with his "hands in the air," defendant did so. Officers immediately handcuffed and *Mirandized* him. Sergeant Mastripolito then began to converse with defendant.

Mastripolito first told defendant about the pistol-whipping allegation. Defendant denied it. In response to Mastripolito's question whether defendant had "any guns in the house," defendant said "no." After telling defendant that it was his job "to find the truth," Mastripolito asked if there were any weapons in the house. Defendant responded "no." Mastripolito asked, "Can we check?" Defendant responded "yes." Mastripolito then asked, "You wouldn't mind if we checked?" Defendant responded "no."

Mastripolito then explained to defendant that checking the house for guns could help police corroborate defendant's version of events. He also told defendant that the purpose of "check[ing]" for a gun was for safety:

> "I appreciate that, and I want to talk to you about it. This is all for everybody's safety, all right? When people say the word 'gun,' we kind of get a little—it's okay to go into your house? And we got to go into your house. Okay."

Mastripolito stayed with defendant outside, continuing to converse with him, while other officers entered the house. Mastripolito also was in radio contact with the officers inside the house. After telling them what bedroom was defendant's, he asked defendant, "Does your room have a key? The lock—you have a padlock on your room?" He then asked whether officers could "look in there?" Defendant responded, "Yeah. Do you want me to unlock it?" Mastripolito declined defendant's offer to unlock his bedroom door, and asked defendant which key was the one for the padlock on the door. Defendant told Mastripolito that the keys were in the grass. Officers retrieved them and used them to open the padlock on his bedroom door.

Officers then searched defendant's bedroom. They discovered a locked safe in defendant's closet. They then used one of defendant's keys to open the safe; they did not ask for defendant's permission first. Inside the safe, they found MDMA and two guns. Defendant was charged with unlawful possession of a controlled substance, second-degree

assault, unlawful use of a weapon, and menacing. The state later dismissed the last three charges.

Before trial, defendant moved to suppress evidence of the MDMA found in the safe in his bedroom. He argued that the state had procured it in an unconstitutional warrantless search, in violation of defendant's rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Although defendant acknowledged that he had said yes when police asked if they could check his home for firearms, he contended that, in doing so, he had not authorized police to open his locked safe. The state responded that by authorizing the officers to enter his home to look for guns, defendant authorized them to look any place where guns might be located, including the locked safe. The trial court agreed with the state and denied the motion to suppress. Defendant waived his right to a jury trial, and the trial court found him guilty as charged. As mentioned above, a judgment extending defendant's probation in another case was entered based on the guilty verdict.

Defendant appealed both judgments. On appeal, he assigns error to the trial court's denial of his motion to suppress and, relatedly, to the probation-violation finding based on his conviction. He contends that the trial court erred when it determined that he consented to a search of the locked safe. For the following reasons, we agree.

It is undisputed that defendant authorized officers to enter his house to "check" for weapons. The question is whether, by opening defendant's locked safe, officers exceeded the scope of the "check" authorized by defendant. Because defendant's grant of authority to officers to check his house for weapons was ambiguous as to whether it encompassed opening defendant's locked safe, the answer to that question hinges on defendant's actual intent in authorizing officers to check his house for weapons. *Blair*, 361 Or at 537-38. In particular, it hinges on whether defendant actually intended to authorize police to open his locked safe. *Id*. That, the Supreme Court has explained, is a question of fact. *Id*. at 537. Accordingly, we review the trial court's determination that defendant intended to consent to a search of the safe to

determine whether there is constitutionally sufficient evidence to support it. *Id*. at 537-38; *State v. Cross*, 316 Or App 506, 512-13, 502 P3d 753 (2021).

In this case, we conclude that the evidence is not sufficient to allow for a reasonable inference that defendant intended to authorize officers to open his locked safe in the course of checking his home for weapons. In so concluding, we analyze defendant's interaction with police in two stages. We look first at whether it is inferable that when defendant initially authorized police to conduct a weapons check, he intended to authorize them to open locked containers and, if it is not, whether it is inferable that he intended to expand the scope of consent later on by giving his keys to officers.

Starting with the first stage, it cannot reasonably be inferred that, at the outset of the search, defendant intended to authorize officers to open the locked safe. That is so for two reasons. First, officers requested and received consent to "check" for weapons in the house. Unlike, for example, the word "search," the word "check" does not suggest the type of highly intrusive inspection that would extend to opening locked containers. Rather, it tends to suggest a more cursory inspection. *See, e.g.*, *Webster's Third New Int'l Dictionary* 381 (unabridged ed 2002) (defining "check" relevantly as "to investigate and make sure about condition and circumstances : obtain confirmation or substantiation <~*ing* on her passenger's safety belts \* \* \*>"; *see also Merriam-Webster's Collegiate Dictionary* 195 (10th ed 1999) (defining "check" relevantly as "to inspect, examine, look at appraisingly"); *cf. Webster's* at 2048 (defining "search" relevantly as "to look into or over carefully or thoroughly in an effort to find something," and "to uncover, find, or come to know by diligent persevering inquiry or scrutiny"). In view of the ordinary meaning of the word "check," we do not think it reasonable to infer that defendant, by agreeing that officers could "check" his house for weapons, intended to consent to an intrusion that extended to opening locked doors. Second, and more significantly, defendant did not offer his keys to officers when he consented to a weapons check. That defendant did not give officers the means to open his locked safe makes it unreasonable to infer that defendant intended to consent to officers opening the locked safe.

We accordingly examine the second stage of defendant's interaction with officers. The remaining question is whether the evidence allows the rational inference that defendant intended to expand the scope of his consent at that stage, when he pointed officers to his keys in the grass and allowed them to take them to unlock the padlock on his bedroom door. We do not think so. When officers asked for defendant's keys, they communicated that they were asking for them for the single purpose of unlocking the padlock on defendant's bedroom door. All that can reasonably be inferred from that exchange is that defendant intended to permit officers to enter his bedroom. Absent evidence of some discussion between defendant and officers about using the keys to open locked doors or containers other than defendant's locked bedroom door, the evidence is not legally sufficient that, by giving officers the keys, defendant intended to expand the scope of the consent he granted in authorizing officers to check for weapons. When one person hands another their key ring for the purpose of using a specific key to open a specific lock, it is not reasonable to infer that the owner of the keys intends to consent broadly to using other keys on different locks; a person using other keys on the ring for other purposes would transgress social norms. *See, e.g.*, *State v. Goldberg*, 309 Or App 660, 664-68, 483 P3d 671 (2021) (en banc) (examining whether officer's behavior upon entering curtilage of property comported with social norms to determine whether officer conducted search by exceeding property owner's implied consent to enter curtilage of the property). The record supplies no basis to infer that defendant intended to authorize such use of his keys. Accordingly, the fact that defendant let officers use his keys to open his bedroom door does not support the rational inference that he consented to officers opening his locked safe in the course of their weapons check.

Because it cannot be inferred that defendant consented to the warrantless search of his locked safe, defendant is entitled to suppression of the evidence found in the locked safe, including the MDMA. We therefore reverse and remand both judgments on appeal for further proceedings consistent with this opinion.

Reversed and remanded.