No. 926 December 26, 2024 47

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUAN MANUEL LEOS-GARCIA,
*Defendant-Appellant.*

Marion County Circuit Court
21CR39229; A179812

David E. Leith, Judge.

Argued and submitted on September 24, 2024.

Joshua B. Crowther, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Armstrong, Senior Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

When two police officers wake you up from a nap in your parked car on your driveway at three o'clock in the morning, you probably wouldn't expect to hear them say that you implicitly invited them to do so. In this case, defendant argues that the trial court erred in denying his motion to suppress, which resulted in convictions for driving under the influence of intoxicants (DUII), ORS 813.010, and refusal to submit to a breath test, ORS 813.100, because police officers exceeded the scope of any "implied consent" when they entered his driveway without a warrant at three o'clock in the morning and circled his vehicle to search for evidence of a crime. Because such behavior violated defendant's constitutional rights, we reverse the lower court's judgment and remand for a new trial with an order to suppress the disputed evidence.

## I.   BACKGROUND

Around 1:30 a.m., a vehicle matching the description of defendant's—a white pickup truck—struck a parked car belonging to the victim and drove away. Later that night, around 3:00 a.m., the victim called Woodburn Police Officer Mitchell and told him that he saw the truck parked at defendant's house. Mitchell and Officer Ponce arrived at defendant's residence shortly thereafter and heard from the victim that defendant was sleeping in defendant's vehicle—a pick-up truck with a trailer attached to the back—parked at the end of his driveway.

Because this case involves implied consent to approach the entrance of defendant's home, the layout of defendant's property matters. Defendant's house is on a corner lot located at the intersection of two streets. The front door faces one street, and the paved driveway and back door face the other. At the end of the driveway is a covered carport to the right of the back door. Mitchell testified that he "kn[ew] that particular house," and Ponce testified that the back door is "a door that people can approach and knock on," about "15 feet from the roadway." Defendant's truck was parked to the right of the carport, on the far-right side of the driveway, next to a shed. From their vantage point standing

on the sidewalk, Mitchell and Ponce were unable to see any-
one inside the truck.

Mitchell and Ponce went up the driveway and
walked around defendant's vehicle. In doing so, Ponce
stepped over a trailer hitch connecting defendant's vehicle
to a trailer behind it. Both officers testified they walked
around the truck looking for evidence of the hit-and-run
and observed defendant sleeping in the vehicle. The officers
woke defendant up and defendant exited his vehicle. The
officers observed that defendant was clearly intoxicated, and
had bloodshot eyes, slurred speech, and the smell of alco-
hol on his breath. The officers arrested defendant for DUII
and placed him in handcuffs.[1] Defendant declined to take a
breath test and was cited for refusal under ORS 813.095.[2]
At no point did Mitchell or Ponce obtain a warrant to enter
defendant's property.

Prior to trial, defendant moved to suppress the evi-
dence stemming from the search on his driveway, including
his refusal to take a breath test. In support of his motion,
defendant argued that law enforcement's warrantless entry
constituted a trespass and unlawful search, violating his
state and federal constitutional rights. The state responded
that the police officers had implied consent to approach defen-
dant on his driveway and ask him questions. Additionally,
the state responded that evidence of defendant's refusal to
submit was admissible. The trial court denied the motion to
suppress, concluding that the officers had implied consent to
approach the vehicle to contact defendant, since there was
some evidence that defendant might be sleeping in the vehi-
cle; and, in any event, approaching the residence by walking

---

[1]   The parties do not argue, and we do not decide, whether the state had suf-
ficient probable cause to arrest defendant—who was sleeping in his vehicle on his
driveway—for DUII, which requires that defendant unlawfully drove a vehicle
upon "premises open to the public." ORS 813.010(4).

[2]   ORS 813.095 provides, in relevant part:

"(1) A person commits the offense of refusal to take a test for intoxicants if
the person refuses to:

"(a) Take a breath test when requested to do so * * *.

" * * * * *

"(2) The offense described in this section, refusal to take a test for intoxi-
cants, is a specific fine traffic violation."

on the driveway was not unreasonable, even if it wasn't the most obvious way to access the home.

Defendant entered a conditional plea, reserving the right to challenge the trial court's adverse ruling on the motion to suppress. This appeal timely followed.

On appeal, the parties focus their arguments on whether the officers had implied consent to approach defendant in his truck parked at the end of his driveway, and whether their conduct violated Article I, section 9, of the Oregon Constitution.[3] Additionally, the state raises the argument, for the first time on appeal, that, even if the officers' actions were unlawful, any illegality was attenuated by defendant's refusal to submit to a breath test, thus making the evidence admissible.

## II.   DISCUSSION

We review a trial court's ruling on a motion to suppress for legal error. *State v. Goldberg*, 309 Or App 660, 663, 483 P3d 671 (2021). We are bound by the trial court's factual findings if there is constitutionally adequate evidence to support them. *State v. Edwards*, 319 Or App 60, 62, 509 P3d 177, *rev den*, 370 Or 212 (2022) (citing *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993)). If the trial court did not make express findings of fact on all pertinent issues, we "presume that the facts were decided in a manner consistent with the court's ultimate conclusion," but only if the evidence allows for application of that presumption. *Ehly*, 317 Or at 75.

A.   *Article I, Section 9*

Article I, section 9, of the Oregon Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure[.]" The protections of Article I, section 9, guard both against unreasonable warrantless entries into the home and "curtilage," an area which includes "the land immediately

---

[3] The parties also raise less-developed arguments under the Fourth Amendment to the federal constitution. *See* US Const, Amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). Because the state constitutional issue is dispositive, we need not reach the federal issue. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (explaining "first things first" doctrine).

surrounding and associated with the home," *State v. Dixson/ Digby*, 307 Or 195, 209, 766 P2d 1015 (1988) (citations omitted), such as driveways. *State v. Olinger*, 240 Or App 215, 222, 246 P3d 20 (2010), *rev den*, 350 Or 423 (2011).

However, when considering intrusions onto the curtilage of a home, there is an operative, but rebuttable, presumption "that the landowner has impliedly consented to visitors going to the front door of the house." *Goldberg*, 309 Or App at 665. This "implied consent" exception recognizes that there are certain types of casual intrusions—*e.g.*, motorists running out of gas, Girl Scouts selling cookies, political candidates canvassing door-to-door—that are not trespasses, but merely a part of living in a connected, civil society. *State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den*, 298 Or 334 (1984) ("[U]nless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion."). Officers, too, may pierce the curtilage and lawfully go to the front door of the home, so long as they act within the scope of the homeowner's implied consent. *Goldberg*, 309 Or App at 665. If an officer exceeds the scope of consent, the officer is trespassing and engaging in an unconstitutional search. *Id.*

When evaluating the scope of a homeowner's implied consent, we consider whether an officer complies with social norms expected of regular visitors to the property, looking both to the officer's *location*, as well as the officer's *behavior*. *Id.* at 665-66 (citing *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995)). In general, "[a]n officer exceeds the implied consent as to location when the officer deviates from the path to the front door and explores other areas of the curtilage where, according to social norms, visitors would not have an implied invitation." *Id.* The same social norms constrain a police officer's behavior, even when his location is otherwise lawful. *Portrey*, 134 Or App at 463; *State v. Cardell*, 180 Or App 104, 108, 41 P3d 1111 (2002); *Goldberg*, 309 Or App at 666. The police must behave within the expected norms of a reasonable social guest. *Goldberg*, 309 Or App at 666.

With this framework in mind, we turn to the facts of this case. The officers did not exceed the scope of implied

consent when they began walking on the driveway towards the back door of the house. As Ponce testified, and the trial court found, the driveway was not an unreasonable way to approach the house. The back door at the top of the driveway was a door that visitors could use to approach the house. In fact, visitors standing on the street facing that door would only be able to see that one door to the house. There were no signs, fences, or other indications that visitors were not welcome to approach the door. *See State v. Glines*, 134 Or App 21, 25, 894 P2d 516, *rev den*, 321 Or 512 (1995) (side door to house was subject to implied consent when visible from public sidewalk, equipped with doorbell, not fenced, and near front wall of defendant's house). In pictures of the home submitted by defendant to the trial court, the door appears to be lit by an overhead light and the pathway to the door is clear of any obstacles—further indicating that defendant welcomed visitors to the entrance. *Cf. Ohling*, 70 Or App at 253 (holding that officers could not go to backyard of home to serve a warrant, notwithstanding evidence that defendant may have been home at the time, because no facts showed that defendant welcomed visitors to his backyard).

However, the officers exceeded the scope of any implied consent, both in terms of location and behavior, when they deviated from the path to the door by walking up to defendant's vehicle, stepping over the trailer hitch, and moving around the vehicle. At that point, officers were no longer in the location of a reasonable social visitor—*i.e.*, the direct path from the sidewalk to the door. Crucially, there was no evidence that defendant impliedly consented to being contacted in that location, notwithstanding the officers' belief that defendant may have been sleeping in his vehicle. *Cf. State v. Gabbard*, 129 Or App 122, 128-29, 877 P2d 1217, *rev den*, 320 Or 131 (1994) (defendant impliedly consented to contact by shed across from house, as opposed to front door of house, because he walked out of shed and went up to detectives to speak with them). And, as explained below, officers were no longer behaving as a reasonable social visitor would be expected to behave because a reasonable social visitor would not walk around the resident's car in their driveway at three in the morning. *See Goldberg*, 309 Or App at 663 ("[T]he touchstone of the inquiry *** is focused on

the reasonable scope of permission a landowner holds out to the public for social entry, and the norms of behavior reasonably expected of social visitors.").

Both parties cite our en banc decision in *Goldberg* as controlling but disagree as to its application. In *Goldberg*, police received information that the defendant's vehicle likely was involved in a hit-and-run. The police deputy walked up the driveway to the defendant's home, where he located the defendant's parked vehicle. The deputy bent down to compare a piece of evidence collected at the scene of the accident with the defendant's vehicle and took a picture of him holding the piece against the bumper. *Id.* at 662.

We held that the officer, standing in the driveway, did not exceed the scope of consent as to location. *Id.* at 668 (citing *Cardell*, 180 Or App at 108 ("Visitors, including the police, have implied consent to enter the driveways and front yards of homes.")). However, the officer's behavior of bending down to take a photo exceeded the scope of consent because it violated expected social norms:

> "[T]he average home occupant would be reasonably concerned to find a stranger squatting down by the front of their car, parked in their driveway, holding up an object and photographing the vehicle. Rather than being the normal social behavior one reasonably expects from a visitor, this is the type of behavior that is more likely to draw, at a minimum, a shout of alarm and inquiry—'Hey! What are you doing?'—if not a call to the police. The officer here stood in no superior position to a stranger. Acts that would be seen as intrusive and unacceptable by a nosy neighbor are no less so when performed by law enforcement."

*Id.* at 669.

Here, the officers' behavior, similar to the behavior in *Goldberg*, would elicit alarm from the average home occupant. The typical social visitor does not circle around a vehicle to the right of a carport in a stranger's driveway, inspecting it for damage, because that would be considered "intrusive and unacceptable" by societal norms. *Goldberg*, 309 Or App at 669; *see also Portrey*, 134 Or App at 463 (officer turning over boot on front porch of home unconstitutional search); *Cardell*, 180 Or App at 108 (officer feeling

heat of car tires walking up driveway to front door of home unconstitutional search).

The state argues that it would not be unreasonable for a social visitor—having learned that a resident is inside a vehicle—to approach that vehicle to contact the resident. Maybe so. But that argument fails to account for what actually occurred here: at three o'clock in the morning, two officers walked onto defendant's driveway, and circled his vehicle inspecting it for damage related to a hit-and-run. The implied consent exception cannot stretch that far, even accounting for a society in which certain types of unexpected contact are bound to occur. *Ohling*, 70 Or App at 253. More to the point, we can think of no purpose for the officers' behavior in circling the vehicle other than a warrantless search.[4] From the perspective of the homeowner, the officers' behavior was unreasonable and alarming—a contact to which he did not consent.

In sum, we hold that the "implied consent" exception allows for police officers' warrantless entries onto the curtilage of the home, so long as officers limit their location and conform their behavior to that of a reasonable social guest. Typically, that will mean that officers may approach the front door to contact the occupants of a home. The officers' behavior here—circling and inspecting a vehicle on the side of the driveway—exceeded the scope of any implied consent.

B. *Attenuation*

Finally, the state argues—for the first time on appeal—that, even if the officers acted unlawfully in conducting a warrantless search on the curtilage of defendant's home, defendant's subsequent action of refusing to submit

---

[4] In its brief and at oral argument, the state argued that the officers did not "circle" the truck but rather approached it on either side to contact defendant and happened to observe evidence of the hit-and-run in plain view. That is not a finding that could have been made on this record. At the motion to suppress hearing, Mitchell testified, "I moved around the vehicle because it being a suspect vehicle on a hit-and-run, I wanted to see if the damage was consistent with the damage to the victim's vehicle." And Ponce testified, "Officer Mitchell and I arrived, and we proceeded to make contact with the person that was sleeping behind the wheel. Before doing so, we walked around the truck and we located what we believed was evidence of the hit-and-run."

to a breath test attenuated the taint of the unlawful search. The state cites to *State v. Suppah*, 358 Or 565, 576, 369 P3d 1108 (2016), for the general proposition that "a defendant's decision to commit a new crime in response to an unlawful seizure ordinarily will attenuate the taint of the seizure."

Although that argument was not properly raised below, we have, on occasion, affirmed a new argument on appeal under a "right for the wrong reasons" exception. *See State v. Flores*, 317 Or App 288, 295, 505 P3d 507 (2022) (citing *Outdoor Media Dimensions*, 331 Or 634, 659, 20 P3d 180 (2001)). Under those principles,

> "[f]or us to affirm a trial court's ruling on a basis other than that on which the court relied, (1) 'the facts of record [must] be sufficient to support the alternative basis for affirmance'; (2) 'the trial court's ruling [must] be consistent with the view of the evidence under the alternative basis for affirmance'; and (3) 'the record [must] materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below.'"

*State v. Booth*, 272 Or App 192, 199, 355 P3d 181 (2015) (quoting *Outdoor Media*, 331 Or at 659-60).

However, the state is wrong for several reasons: first, the refusal to take a breath test is not a criminal offense. *State v. Roeder*, 209 Or App 199, 205, 147 P3d 363 (2006), *rev den*, 342 Or 474 (2007) (finding that "the legislature did not intend refusal to take a breath test to be a criminal offense" because violation is described as "traffic offense" and only punishable by fine). Thus, a defendant's decision to refuse to consent to a test is far from a "decision to commit a new crime."

Second, there are specific instances where the decision to refuse to take a breath test, far from being a crime, may be protected activity in itself. All drivers have the right to refuse to consent to a warrantless breath test at the time of arrest, if such consent would be the sole constitutional basis for the search. *State v. Banks*, 364 Or 332, 434 P3d 361 (2019); *see also State v. Swan*, 363 Or 121, 145, 420 P3d 9 (2018) ("[A] DUII suspect does have a statutory right to decide whether to submit or refuse to submit to a breath

test."). Given that these specific arguments were never raised below, the record very well could have developed differently had the state argued attenuation due to a subsequent "bad act" by defendant.[5]

The "implied consent" exception allows for police officers' warrantless entries onto the curtilage of the home, so long as officers limit their location and conform their behavior to that of a reasonable social guest. Typically, that will mean that officers may approach the front door to contact the occupants of a home. The officers' behavior here—circling a vehicle on the side of the driveway to look for evidence of a crime—exceeded the scope of any implied consent. Accordingly, we reverse the lower court's judgment and remand for new trial with an order to suppress the disputed evidence.

Reversed and remanded.

---

[5] The state is wrong for an additional reason: its argument, when taken to its logical extreme, could result in officers entering individuals' homes at any time, demanding that they submit to a breath test, and then using their refusal as justification for a subsequent search that could not be suppressed under any conditions. That "oppressive interference" Article I, section 9, forbids. *See State v. Keller*, 361 Or 566, 582, 396 P3d 917 (2017) (Article I, section 9, "imposes limits on searches and seizures in order to prevent arbitrary and oppressive interference by law enforcement officials with the privacy and personal security of individuals" (internal quotation and brackets omitted)).